COOPERATIVA CAFETEROS DE PUERTO RICO, demandante y recurrida *v.* RAMÓN COLÓN TORRES y CARLOS M. MATOS, ETC., sustituidos por LUIS RIVERA SANTOS y AUGUSTO N. ACEVEDO, demandados y recurrentes.[1]

*Número:* 12478   *Resuelto:* 21 de diciembre de 1961

[1] Durante la vista del caso se sustituyó formalmente a Ramón Colón Torres por Luis Rivera Santos, como Secretario de Agricultura y a Carlos M. Matos por Augusto N. Acevedo como Inspector de Cooperativas. De acuerdo con las disposiciones de la Ley núm. 4 de 1 de mayo de 1957 se transfirieron las funciones del Secretario de Agricultura y Comercio en relación con la Oficina del Inspector de Cooperativas a la Administración de Fomento Cooperativo.

*Francisco Espinosa, Secretario de Justicia Interino, J. B. Fernández Badillo, Procurador General, Edgar S. Belaval, Procurador General Auxiliar,* abogados de los recurrentes; *Héctor González Blanes, S. L. Lagarde Garcés* y *Francisco Parra Toro,* abogados de la recurrida.

Sala integrada por el Juez Presidente señor Negrón Fernández como Presidente de Sala y los Jueces Asociados señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El Inspector de Cooperativas solicitó de "Cafeteros de Puerto Rico" una extensa información relacionada con las operaciones de esa cooperativa. Al final de esta opinión aparece como apéndice la comunicación del Inspector de Cooperativas. "Cafeteros" preparó un documento conteniendo toda la información solicitada y su junta de directores, en una primera reunión, acordó rendir el informe. En reunión posterior, los directores reconsideraron su anterior acuerdo e informaron al Inspector de Cooperativas que no le rendirían el informe, pero que éste podía inspeccionar el documento preparado conteniendo todo lo solicitado y tomar las notas que estimara conveniente. El Inspector no aceptó y le manifestó a "Cafeteros" que debían enviarle copia del informe por correo a su oficina. "Cafeteros" no lo hizo y transcurridos 30 días desde la fecha en que el Inspector solicitó que se le enviara por correo el informe, le impuso una multa de $5.00 diarios por cada día que transcurriera sin que se enviara, hasta un máximo de quince días. 5 L.P.R.A. sec. 912. "Cafeteros" apeló ante el Secretario de Agricultura de esta decisión, pero éste se declaró sin jurisdicción. Instituyó entonces el presente recurso de sentencia declaratoria.

La cuestión a dirimir según se expuso en la demanda es "[s]i la información solicitada . . . es o no de la naturaleza y

carácter de aquellos informes a que se refiere la sección 16 de la Ley Núm. 291 del 1946, [5 L.P.R.A. sec. 896]".

Dispone así la mencionada disposición:

"Cada asociación organizada de acuerdo con esta ley preparará y redactará un informe anual manifestando lo siguiente:

1. Nombre de la sociedad.

2. Sitio principal de sus negocios.

3. Un estado general de sus operaciones comerciales durante el año económico, demostrativo de las acciones pagadas y del **número** de accionistas, si es asociación por acciones, o del número de miembros y el montante de las cuotas de entrada, si es asociación sin acciones.

4. El volumen de negocios con socios y no socios.

5. Un informe detallado de gastos e ingresos.

6. Su Estado de Situación al cierre de operaciones.

7. Cualquier otra información que el Inspector de Cooperativas, . . . juzgue necesaria.

Copia de este informe será enviado al Inspector de Cooperativas de Puerto Rico y al Departamento de Cooperativas del Servicio de Extensión Agrícola de la Universidad de Puerto Rico, certificado por el Presidente y el Secretario de la asociación.

Cuando una sociedad cooperativa dejare de someter al Inspector de Cooperativas el Informe Anual ya mencionado en esta sección, a la fecha de su vencimiento *o cualquier otro informe que éste solicite . . . .*"

El Juez de instancia al resolver la cuestión concluyó que "la solicitud del Inspector de Cooperativas de Puerto Rico . . . constituyó un ejercicio irrazonable de su facultad para requerir el envío de informes especiales, dentro del significado del artículo 16 de la Ley de Cooperativas de Puerto Rico. Un examen de los particulares contenidos en la carta de referencia, tomada conjuntamente con la evidencia que desfiló durante el acto del juicio, nos convence, en primer lugar de que, *aun cuando la información es pertinente a los fines de un examen practicado en los libros de la Asociación por un agente del Inspector demandado, el requerir el envío de un informe especial no tiene fundamento alguno desde el punto de vista de*

*fiscalización.* Es decir, si el objetivo del demandado era el de llevar a cabo una fiscalización del informe originalmente sometido por la demandante, no se lograría provecho alguno con requerir a la misma persona que rindió el informe original, que rindiera un informe detallado sobre los mismos extremos. La veracidad concedida al primer informe tenía necesariamente que ser exactamente igual que la del informe particularizado por razón de haber sido rendido por la misma persona. En segundo lugar, el insistir en que la información solicitada fuese rendida por escrito y enviada al demandado por correo —a pesar de la oferta de la demandante de facilitar al Inspector los medios de cotejar la misma—convirtió el requerimiento en uno irrazonable. Con ello se obligaba a la demandante a revelar secretos del negocio o información confidencial, tal como el nombre de los compradores de café en el extranjero y los costos de producción." (Énfasis suplido.)

Antes de pasar a considerar el problema que presenta este recurso vale apuntar que la Asamblea Legislativa ha considerado que el cooperativismo está permeado de un enorme interés público. De ahí, que al aprobarse la Ley General de Sociedades Cooperativas, Ley 291 de 9 de abril de 1946— 5 L.P.R.A. sec. 881 *et seq.* expresara lo siguiente en la Exposición de Motivos:

"La práctica de la acción cooperativa en todos los aspectos de nuestra vida económica y social, inspirada en una filosofía de renovación humana, debe ser uno de los instrumentos más valiosos y eficaces para la solución del problema global de la Isla. En primer lugar, puede contribuir eficazmente al logro de una mayor producción de riqueza y a una distribución más equitativa de la misma. A fin de asegurar, por ejemplo, un mayor poder adquisitivo a los escasos recursos de nuestra población, de suerte que haya mayor cantidad de bienes para consumir, y el disfrute de más y mejores servicios sociales y económicos, tanto la compra de artículos para el consumo de la vida diaria, como la prestación de los servicios varios que debe recibir la comunidad, deben organizarse, hasta donde las circunstancias lo justifiquen, en forma cooperativa."

Instrumentando esta política, las cooperativas han recibido un trato especial de la Asamblea Legislativa. Han recibido beneficios y ventajas que no se le reconocen a otras entidades. Exención de toda contribución sobre la propiedad mueble e inmueble hasta un valor de tasación de cien mil (100,000) dólares, Ley 291 de 1946, art. 26—5 L.P.R.A. sec. 906, exención de contribuciones sobre ingresos, ib. art. 27, 5 L.P.R.A. sec. 907; exención del pago de patentes municipales en cuanto al volumen de negocios efectuados con sus socios, Ley Núm. 81 de 20 de junio de 1955, 5 L.P.R.A. sec. 918; ventas de propiedad inmueble del gobierno a cooperativas sin que medie subasta, Ley 97 de 24 de junio de 1960, 5 L.P.R.A. sec 925; entre otras. A cambio de las ventajas concedidas se ha establecido por ley una estricta supervisión a cargo del Inspector de Cooperativas, ya que, según se expresó en la antes mencionada Exposición de Motivos, "[l]os esfuerzos llevados a cabo hasta la fecha en la organización de cooperativas en Puerto Rico han adolecido de cinco grandes defectos, a saber: 1 . . . 2 . . . 3. Falta de un sistema de contabilidad utilizados, como al cumplimiento de los principios del cooperativismo por las cooperativas mismas". ■

De acuerdo con la Ley General de Sociedades Cooperativas de Puerto Rico, el Inspector de Cooperativas de Puerto Rico es el funcionario encargado de hacer cumplir las disposiciones de la mencionada ley. Se le fijan ciertos poderes y obligaciones, —artículo 19—5 L.P.R.A. sec. 899—incluyendo entre ellos los siguientes:

"a. Requerir de la Junta de Directores de la cooperativa que ésta corrija las irregularidades que señale el Inspector o llame a una asamblea de socios para que ésta lo haga.

"b. Convocar, si la Junta de Directores se negara a ello, a una asamblea extraordinaria de los socios de la cooperativa para explicar ante la misma las irregularidades señaladas por el Inspector con el fin de que se corrijan.

"c. Recomendar al Secretario de Estado la cancelación del

certificado de registro cuando no sea posible corregir las irregularidades."

Para poder cumplir con tan amplia facultad el Inspector tiene el poder de investigar y requerir informes de las cooperativas para poder estar en condiciones de determinar si se han cometido irregularidades y en qué consisten éstas. La ley ·establece, como hemos visto del transcrito artículo 16, que las cooperativas deberán rendir un informe anual contentivo de lo que se dispone en el referido artículo. Dispone además ·que rendirán los otros informes que el Inspector les solicite.

En adición a la anterior disposición la ley "autoriza al Inspector de Cooperativas que examine e investigue las cuentas, libros, acuerdos, transacciones, propiedades, contratos, fondos, inversiones o cualesquiera otras materias o actividades relacionadas con la situación económica y funcionamiento de las cooperativas". Ley Núm. 312 de 13 de mayo de 1949, art. 2—5 L.P.R.A. sec. 911. Se dispone además que el Inspector de Cooperativas podrá cobrar a toda cooperativa cuyo volumen de negocios sea mayor de $100,000 el costo total en que hubiere incurrido con motivo de los exámenes e investigaciones que efectúen en relación a dicha cooperativa, ib. art. 3, 5 L.P.R.A. sec. 912.

Obviamente, las disposiciones del artículo 16 que tratan sobre el informe anual o informes adicionales y la que acabamos de mencionar se complementan. Lo requerido en los seis primeros apartados del artículo 16 claramente no suministra en todos los casos, suficiente información para que el Inspector pueda llenar a cabalidad el cometido que la ley le encomienda. Es por ello que el séptimo inciso dispone que la cooperativa deberá suministrar cualquiera otra información que el Inspector juzgue necesaria y que la cooperativa está obligada a rendir cualquier otra información que el Inspector solicite. Estas disposiciones son amplias y abarcadoras y autorizan a solicitar cualquier información que el Inspector estime pertinente, claro está dentro de las atribuciones que la ley le confiere. ■

La disposición que trata sobre la facultad de investigar se aplica a situaciones en las cuales el Inspector no está en condiciones de determinar previo a la investigación cuál es la información que interesa. En esos casos, practica la investigación. Ahora si el Inspector de antemano está en condiciones de solicitar una información específica, la cooperativa está en el deber de suplirla. El hecho de que el Inspector tenga el poder de investigar no implica que la cooperativa pueda negarse a suplir una información que el Inspector le solicita, amparado en las disposiciones del artículo 16 antes citado. ■

Se ha establecido jurisprudencialmente que las agencias administrativas tienen amplios poderes para solicitar información e investigar los organismos que la ley le autoriza reglamentar y supervisar. Originalmente se había sostenido que las agencias administrativas no podían hacer expediciones de pesca en los organismos que reglamentaban, *Fed. Trade Comm.* v. *Amer. Tobacco Co.*, 264 U. S. 298 (1924) pero la tendencia desde que se resolvió el caso de *United States* v. *Morton Salt Co.*, 338 U. S. 632 (1950) es reconocer a las agencias administrativas amplios poderes para solicitar información de e investigar los organismos que éstas regulan y supervisan. 1 Davis, *Administrative Law*, sec. 3.06 (ed. 1958).

Así se expresó el Tribunal Supremo de los Estados Unidos en el caso de *Morton Salt*:

"Aún cuando las corporaciones pueden y deben estar protegidas de requerimientos ilegales hechos so pretexto de una investigación pública, cfr. *Federal Trade Comm'n* v. *American Tobacco Co.*, 264 U. S. 298, éstas no pueden reclamar que se les equipare a los individuos en el disfrute del derecho a la privacidad. Cfr. *United States* v. *White*, supra. Ellas poseen atributos públicos. Tienen un impacto colectivo sobre la sociedad, de la cual derivan el privilegio de actuar como entidades artificiales. El Gobierno Federal les concede el privilegio de dedicarse al comercio interestatal. Los favores del Gobierno frecuentemente conllevan una mayor medida de reglamentación. (citas)

Aún si consideramos la información solicitada en este caso como motivada meramente por la curiosidad oficial, sin embargo los organismos llamados a hacer cumplir las leyes tienen el legítimo derecho de cerciorarse de que las corporaciones actúan de acuerdo con la ley y con el interés público.

Desde luego una investigación gubernamental de los asuntos de una corporación puede ser de una naturaleza tan abarcadora y tan no relacionada con la materia bajo investigación que exceda el poder de investigación *Federal Trade Comm'n* v. *American Tobacco,* supra. Pero es suficiente si la investigación está dentro de la autoridad de la agencia, el requerimiento no es demasiado indefinido y la información solicitada es razonablemente relevante. 'La esencia de la protección consiste en el requisito, expresado en forma concreta, de que la divulgación requerida no sea irrazonable'. *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 208. Nada, que conste de la faz de la orden de la Comisión, excedió estos límites.'

.    .    .    .    .    .    .    .

Desde luego, existen límites en cuanto a lo que, bajo el color de informes, puede exigir la Comisión. No intentamos definir en lo abstracto exactamente cuáles son estos límites. Pero podemos decir con certeza que tales límites impedirían que la Comisión llegara a los extremos del ejemplo extravagante que utilizó uno de los demandados para demostrar lo que teme que ocurra si sostenemos la validez de esta orden—que la Comisión puede requerir informes de las compañías de automóviles que incluyan archivar los automóviles. En el presente caso dudamos que se deba leer la orden, como quieren los demandados, en el sentido de requerir el embarque de vastos archivos o regalos de libros costosos. Ciertamente ésta no es una interpretación obligatoria, y otras partes aparentemente han podido satisfacer los requisitos del decreto." ■

En la obra de Davis, antes citada, al resumir el estado de la ley, en la materia que ahora consideramos, se afirma que ha ocurrido un cambio radical a partir de la década del 1940. Y que ahora se permiten las expediciones de pesca, que casos anteriores del Tribunal Supremo nacional habían proscrito. Afirma que *Morton Salt*, definitivamente estableció la pauta que hoy prevalece en esta fase del derecho administrativo. Davis, *op cit.* sec. 3.14.

Al mismo efecto *Kerr Steamship Company* v. *United States*, 284 F.2d 81 (2do cir. 1960); *Pope & Tabbot Inc.* v. *Smith*, 340 P.2d 960 (Or. 1959). Véase además notas en 34 Minn. L. Rev. 696 (1950); 49 Mich. L. Rev. 436 (1951); 98 U. Pa. L. Rev. 921 (1950); 36 Va. L. Rev. 539 (1950).

Vemos pues que la única limitación que tienen los organismos reguladores y supervisores es que la información solicitada esté dentro de la autoridad de la agencia, el requerimiento no sea demasiado indefinido y la información sea razonablemente relevante.

Si consideramos lo que requirió el Inspector, encontraremos que cumple con lo que se ha sostenido es razonable requerir de un organismo sujeto a investigación y reglamentación de una agencia administrativa. La información solicitada podía servir para que el Inspector pudiera determinar si había habido irregularidades en los negocios y actividades de la cooperativa. Obviamente los datos suministrados en el informe anual, según lo requiere el artículo 16 antes citado, no establecen suficientes pormenores para que el Inspector pueda hacer un juicio justo y razonable de las actividades de una cooperativa. Es por eso que el inciso séptimo le autoriza a solicitar cualquier otra información que juzgue necesaria. El hecho de que solicite una información detallada, mucho más particularizada que la que se incluye en el informe anual, en forma alguna quiere decir que duda de la información suministrada originalmente. Es que interesa conocer todos los detalles para entonces poder hacer un juicio razonable y justo.

Comprendemos que el suministro de esta información detallada podría dar margen a que se conocieran algunas informaciones confidenciales de la cual podrían valerse los competidores de la cooperativa, si se hicieran públicos estos detalles, lo que podría causarle daños en sus negocios. Pero anticipamos que el Inspector usará una sana discreción al determinar qué datos de los solicitados y suplidos podrían hacerse públicos. No hemos de presumir que no tendrá en cuenta el efecto

adverso que pueda ocasionarle a una cooperativa el que cierta información confidencial pudiera llegar a conocimiento de los competidores.

Por otro lado no debemos perder de vista que todos los miembros de una cooperativa tienen interés en conocer cómo marcha la organización a que pertenecen. Esa es la garantía de su éxito. Así como de que cada vez aumente más el movimiento cooperativo en Puerto Rico. Las cooperativas deben ser instrumento de protección para los productores y para los consumidores y es de enorme interés público el que todas sus operaciones sean conocidas por todos los que aunan su esfuerzo para el éxito de las mismas.

*Así, procede pues modificar la sentencia dictada por el Tribunal Superior, Sala de Ponce de fecha 17 de abril de 1957, en el sentido de dejar establecido que el Inspector de Cooperativas no se excedió en el ejercicio de las facultades que la ley le confiere al requerir de la Cooperativa Cafeteros de Puerto Rico que rindiera un informe por escrito conteniendo la información solicitada en la comunicación de 21 de abril de 1953, que aparece transcrita en el apéndice a esta opinión. En cuanto a los otros pronunciamientos de la sentencia que dictara el tribunal de instancia, deben subsistir.*

---

## APÉNDICE

"Oficina del Sec. de Agricultura y Comercio.

21 de abril de 1953

Junta de Directores
Cooperativa Cafeteros de Puerto Rico
Ponce, Puerto Rico

Atención: Sr. Antonio Natali,
Presidente

Señores:

A esta fecha no se ha radicado aún por esa cooperativa el Informe Anual correspondiente al año económico terminado en septiembre 30, 1952 en el formulario oficial requerido por esta Oficina.

Con fecha 10 de marzo de 1953 se recibió copia del informe rendido por su Auditor Externo Sr. Gonzalo Aponte.

Hemos revisado el informe del Sr. Aponte y en relación a los estados que más adelante se detallan necesitamos la siguiente información:

*Estado de Ganancias y Pérdidas*
(Exhibit B del Informe Señor Aponte)

1. *Ventas de Café*

Indíquese total de quintales de café vendido en Estados Unidos y Europa dando nombre de compradores, dirección, cantidad vendida a cada uno, precio de venta e importe de cada venta. Indique si el café es crudo o molido en cada caso. Interesamos también información sobre el sitio en que se formalizó el contrato de venta de estas partidas de café.

2. *Compras de Café*

Sírvanse suministrarnos un desglose de esta partida, valor $249,356.68. Interesamos detalle de las personas, dirección, quintales de café comprado, clasificación de este café, precio pagado por clase e importe total de cada compra.

3. *Costos de Pilado y Tostado de Café*

Suministre desglose de estas partidas.

4. *Gastos de Venta*

a. Sueldos
b. Anuncios
c. Gastos de Venta de Café en Estados Unidos
d. Gastos de Venta de Café en Europa
e. Misceláneas

En relación con las partidas mencionadas sírvanse informarnos nombre, ocupación e importe pagado por concepto de sueldos. Análisis de la partida anuncios, describiendo nombre de los receptores e importe pagado. En relación con los gastos de Venta de Café en Estados Unidos y Europa sírvanse detallarlos, informando nombre y dirección de los intermediarios a quienes se les pagara comisión alguna; si estas partidas incluyen gastos de viaje den detalles de los mismos, y análisis completo de los otros gastos incluidos en estas cantidades. Interesamos también un análisis de la partida Misceláneas, y de incluirse en esta partida

sueldos, comisiones y gastos de viaje, suministre nombre y dirección de los receptores, concepto e importe pagado.

5. *Gastos de Administración*

a. Sueldos y Dietas Directores
b. Bonificaciones a empleados
c. Gastos de Oficinas Locales
d. Gastos de Oficina San Juan
e. Seguro y Contribuciones
f. Gastos de Viaje del Administrador
g. Honorarios Profesionales y Gastos de Hospitalización
h. Donativos
i. Gastos de Propaganda Cooperativa
j. Gastos Misceláneos

Detalle y análisis de estas partidas en los que se relaciona a sueldos, dietas de Directores, bonificación a empleados, gastos de Oficinas locales y Oficina de San Juan. Deberá suministrarse nombre, ocupación e importe pagado en cada caso. Necesitamos desglose de la partida seguro y contribuciones, informando importe y concepto de cada uno. Detalle completo de los gastos de Viaje y de los gastos de Administrador, indicando nombre de oficiales y directores que incurrieron en estos gastos, así como también un análisis completo de los gastos del Administrador. Desglose de la partida Honorarios profesionales y Hospitalización dando nombre de los receptores y descripción de los gastos. Interesamos una relación de todo donativo en exceso de $100. Análisis completo de los gastos de propaganda cooperativa así como también de la partida Misceláneas y, de incluirse en estas partidas, sueldos, comisiones y gastos de viaje, suminístrese nombre y dirección de los receptores, concepto e importe pagado.

6. *Otros Ingresos*

a. Intereses y descuentos recibidos

Indique cuánto se recibió por intereses y cuánto por descuento, explicando el detalle de los descuentos recibidos.

b. Rentas e Intereses Distribuidos a Departamentos

Desglose esta partida e indique método empleado para la distribución de gastos.

c. Balance de Reserva Cancelada

Sírvanse suministrar información sobre esta reserva indicando cuando se crearon las mismas, motivos para su creación, contra qué partidas se cargaron, cantidades utilizadas de las reservas originales y razones para cancelarla.

d. Beneficios en el secado del Café

Someta detalle completo de esta partida indicando ingresos y gastos que motivaron este beneficio. Indique además si este ingreso se distribuye entre determinado número de patrocinadores o entre el total de los socios.

e. Ingresos Misceláneos

Detalle esta partida explicando concepto de dichos ingresos.

7. *Otros Gastos*

a. Intereses pagados

Someta un detalle de estos intereses dando nombre, dirección e importe pagado a cada receptor.

b. Depreciaciones

Indique qué tipos se emplean para calcular la depreciación anual en cada caso.

8. *Cantidad Reservada para reembolsos por patrocinio, emergencias y Otras Pérdidas.*

Suministre detalles completos de esta partida indicando base para los reembolsos de patrocinio e importe total de éstos. Cantidad destinada a emergencias y para cubrir otras pérdidas explicando en cada caso los motivos de los mismos.

9. *Liquidación indicada a cosecheros*

Del informe de los Auditores se desprende que el promedio de Liquidación de café es $50.54. Esta Oficina interesa conocer si hubo un solo precio de liquidación a base de $50.54 por quintal de café o si por el contrario hubo varios precios. En caso de que hubiera más de un precio sírvanse informar los precios de liquidación y las bases empleadas para llegar a tales clasificaciones.

*Estado de Ganancias y Pérdidas*
Departamento de Venta de Productos
(Exhibit C del Informe Sr. Aponte)

1. *Ventas*

Interesamos conseguir un desglose de esta partida por productos o departamentos principales. También deberá suministrarse información sobre ventas a socios y no socios, indicando el total en cada caso.

2. *Gastos en Ventas en Productos*

a. Anuncios
b. Sueldos y Jornales
c. Gastos del Administrador
d. Gastos de Vendedores
e. Sueldo y Gastos del Agrónomo
f. Gastos de Producto—Fort Dodge
g. Gastos Misceláneos

Con relación a la partida de anuncios sírvanse suministrar detalle de estos gastos en que se indique a quiénes se hicieron estos pagos. En cuanto a la partida de sueldos y jornales deseamos un detalle dando nombre, ocupación e importe devengados en cada caso. Desglose la partida de gastos del administrador así como la partida de gastos de vendedores. Deberán suministrar también nombre del agrónomo, sueldo fijo que se le paga explicando el detalle de los gastos y trabajo que realiza. Interesamos conocer el desglose de la partida de gastos Fort Dodge así como los gastos misceláneos.

3. *Otros Ingresos*

a. Reembolsos de Patrocinio
Esta Oficina interesa conocer de quiénes se recibió este patrocinio y si el mismo fue un ingreso en efectivo o un crédito a compras.

4. *Otros gastos*

a. Rentas Intereses y otros Cargos
Suministren desglose de esta partida lo más detalladamente posible.
b. Depreciaciones
Indique qué tipos se emplean para calcular la depreciación anual en cada caso.

*Estado de Situación*
(Exhibit A Informe Sr. Aponte)

### 1. *Cuentas a Cobrar*

Esta Oficina desea un detalle de las deudas de cosecheros, valor $35,820.47 que aparecen en el informe del Sr. Aponte.

Interesamos una relación de las Cuentas a Cobrar del Departamento de Ventas de Productos especialmente aquellos saldos que se informan en la página 7 del Informe de más de 90 días.

También interesamos un detalle de las cuentas a cobrar del Departamento de Leche Rico; cheques de clientes rechazados por el banco con comentarios sobre el por qué no se han realizado las gestiones de cobro del Sr. José Sabater Porrata; indicándose la relación de dicho señor con la administración o directores de la cooperativa, si la hubiere.

Desglósese la partida deudas de empleados dando nombre, ocupación e importe adeudado por cada uno. Así como una relación completa de las cuentas a cobrar clasificadas bajo el título misceláneos.

### 2. *Inventarios*

Esta Oficina interesa saber si esa Cooperativa lleva un tarjetero o Registro de Inventario perpetuo o si los inventarios se determinan a base de contaje físico al cierre de operaciones. Si se usara el segundo procedimiento deberán informar quiénes practican este inventario y el método empleado para el avalúo del mismo.

### 3. *Gastos Diferidos*

a. Cosecha 1952–53

Envíen desglose de esta partida.

b. Pérdida y Gastos liquidación Departamento de Leche

En la página 11 del informe aparece esta partida con $34,115.56. Queremos tener un análisis detallado de esta cantidad. También interesamos se nos informe qué motivos existen para que estos gastos se difieran y cómo piensa liquidarse esta pérdida.

### 4. *Cuentas a Pagar*

a. Reembolso Patrocinio Departamento Ventas de Productos

En la página 12 del informe se indica que la cantidad de

$29,294.03 representa el 2% del Total de las Ventas para el año terminado en septiembre 30, 1952. De acuerdo con el Exhibit de dicho informe las ventas son $2,071,512.99. Queremos conocer qué ventas no recibieron reembolso por patrocinio. También interesamos conocer si el reembolso de patrocinio está incluido en las partidas devoluciones y bonificaciones, valor $32,332.52 que aparece en el referido Exhibit C.

Si el reembolso de patrocinio no estuviera incluido en la partida devoluciones y bonificaciones, ni en la partida Renta interés y otros cargos valor $66,647.13, quisiéramos conocer por qué se ha establecido un patrocinio en exceso del beneficio reportado por el Departamento de ventas de productos por valor de $23,869.56.

### 5. *Reservas*

1. Reservas para Emergencias y Contingencias.

Al comenzar las operaciones, según aparece en el informe del Auditor del 30 de septiembre de 1951 había una Reserva para Emergencia de $6,200.00. Al terminar el año, según el informe del Auditor correspondiente al año terminado en septiembre 30 de 1952, aparece la reserva de Emergencia con un saldo de $3,007.12. Esta Oficina no recuerda haber autorizado cargo alguno contra dicha reserva conforme y según lo dispone la Ley General de Sociedades Cooperativas. Sírvanse remitir un desglose con el movimiento de esta cuenta durante el año, informando a la vez si durante este año esta cuenta recibió crédito adicional de la distribución de beneficios del año 1952.

#### Certificados de Fondo Rotativo

Sírvanse informar todas las transferencias de certificados de Fondo Rotativo efectuadas desde la creación de dicho fondo indicando: Nombre del tenedor original, nombre de la persona a quien se hizo la transferencia, importe total de certificados transferidos, fecha de la transferencia, indicando además si cualquiera de las partes envueltas era miembro de la Junta de Directores o funcionarios o empleado de la Cooperativa en el momento de la transferencia.

La anterior información deberá venir certificada por sus auditores externos y urgiéndonos la misma se le concede un

plazo de 30 días a partir de la fecha de esta carta para la radicación en esta Oficina de la información solicitada. El plazo concedido vence el día 21 de mayo de 1953.

Atentamente,

CARLOS M. MATOS,<br>Inspector de Cooperativas<br>de Puerto Rico.

RBM/olsa"