HÉCTOR LANDRÓN, SALVADOR COLLS y FELIPE AYALA, demandantes y recurrentes, *v.* JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, demandada y recurrida; SAN JUAN RACING ASSOCIATION, interventora y recurrida.

*Número:* 69    *Resuelto:* 21 de enero de 1963

*Víctor M. Bosch* e *Ismael Delgado González,* abogados de los recurrentes; *J. B. Fernández Badillo, Procurador General,* y *Arturo Estrella, Procurador General Auxiliar,* y *José Orlando Grau* y *Rafael Buscaglia, hijo,* abogados de la Junta; *Jorge L. Córdova* y *Hernán R. Franco,* abogados de la interventora.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

La Junta de Relaciones del Trabajo de Puerto Rico expidió dos querellas contra la San Juan Racing Association, Inc., imputándole haber despedido por actividades gremiales a los agentes hípicos Héctor Landrón, Salvador Colls y Felipe Ayala, y, por ende, la comisión de prácticas ilícitas del trabajo dentro del significado de los incisos (a) ([1]) y (c) ([2])

---

([1]) "Intervenga, restrinja, ejerza coerción o intente intervenir, restringir o ejercer coerción con sus empleados en el ejercicio de los derechos garantizados en el Artículo 4 de esta Ley."

([2]) "Estimule, desaliente, o intente estimular o desalentar la matrícula de cualquier organización obrera mediante discriminación al . . . despedir . . ."

del Art. 8 de la Ley de Relaciones del Trabajo de Puerto Rico (Ley Núm. 130 de 8 de mayo de 1945, 29 L.P.R.A. sec. 69 (a) y (c)). La querellada solicitó la desestimación de ambas querellas por los siguientes fundamentos: (1) impugnó la jurisdicción de la junta estatal para conocer del caso; y, (b) adujo, como defensa especial, que los agentes hípicos no son empleados dentro del significado del Art. 3 de la Ley. El segundo planteamiento fue declarado con lugar, y en su consecuencia, se desestimaron ambas querellas. Para revisar este pronunciamiento se presentó la correspondiente petición de revisión.

En la decisión y orden emitida por la Junta se describe la relación existente entre la querellada y los agentes hípicos en la siguiente forma:

". . . La Querellada, con el propósito de aumentar el total de las apuestas, designa agentes en toda la isla de Puerto Rico. Los agentes proveen y pagan la renta del local donde se instala la misma. Pagan luz, agua, teléfono y los gastos de promoción. Designan auxiliares, si lo creen necesario, a quienes el agente paga por sus servicios y son responsables por la negligencia de éstos. La Querellada no interviene en la designación del auxiliar, en el salario ni en ninguna otra condición de su empleo. [Los agentes] [p]roveen todo el equipo y material necesario para la operación de la agencia, excepto una máquina perforadora y los cuadros y papeletas que los suple la Querellada. Sin embargo, tienen que pagar por los cuadros y papeletas que se dañen y un canon de $10.00 mensuales por cada máquina perforadora adicional que se necesite para la operación del negocio. Aunque la Querellada ha señalado un mínimo de horas en que la agencia debe estar abierta al público, los agentes pueden determinar el número máximo de horas que le dedican a su agencia. Pueden delegar, y de hecho delegan, la operación de la agencia en sus auxiliares o relacionados. Pueden dedicarse, y de hecho se dedican, a otras actividades comerciales no competitivas. No tienen un salario fijo ni aparecen en la nómina de la Querellada, ni se les hace deducción alguna por concepto de contribuciones sobre ingresos, seguro social y seguro por desempleo. Reciben como compensación un 10% del total jugado más 4 centavos por

cada cuadro y 3 centavos por cada papeleta jugada. Esta compensación la establece por Reglamento la Comisión Hípica de Puerto Rico. Sus beneficios dependen del esfuerzo individual de cada agente."

Del informe del oficial examinador que presidió la audiencia y de la decisión de la Junta aparecen otros hechos que precisa considerar conjuntamente con los ya reseñados para arribar a la determinación del punto crucial envuelto en el recurso, el verdadero *status* de los agentes hípicos en relación con la empresa. Conviene señalar que la San Juan Racing Association, Inc., ha designado un inspector de agencias para comprobar si las agencias reúnen los requisitos exigidos en cuanto a facilidades físicas, aun cuando la prueba demostró que las inspecciones son infrecuentes. La empresa remite periódicamente instrucciones a los agentes relacionadas con la preparación, reparación y renovación de los locales en donde se establece la agencia,(3) y con la preparación y entrega del material jugado.(4) Se celebraban reuniones

---

(3) Ejemplos son las instrucciones sobre la forma rectangular o cuadrangular que deben tener las agencias, forma de acomodar el equipo, requerimiento de un mostrador, especificación del rótulo que debe colocarse en el exterior de la agencia, apariencia general interior y exterior del local, y otras facilidades que deben ofrecerse al público.

(4) El oficial examinador hace referencia a las circulares cursadas por la empresa sobre los asuntos siguientes:

1. Forma de perforar las tarjetas.

2. Forma de hacer las remesas.

3. Forma y hora de entregar el material en las oficinas del "pool".

4. Necesidad de que los cuadros y las papeletas aparezcan con el sello entregado por la San Juan Racing a los agentes.

5. Notificación sobre la imposición de multas por los cuadros y las papeletas que se dañen debido a la negligencia del agente.

6. Lugar donde deben los agentes recoger los programas oficiales para las carreras.

7. Inventario sobre las máquinas perforadoras en poder de los agentes y apercibiendo con tomar medidas disciplinarias de no hacerse dicho inventario.

8. Forma en que los agentes deben hacer sus liquidaciones.

9. Sobre la necesidad de que se entregue tanto el original como la copia de los cuadros y papeletas nulos a riesgo de que tengan que pagar el valor de los mismos.

para familiarizar a los agentes con el funcionamiento y coordinación del trabajo. Entre los agentes se cuentan personas ausentes, profesionales, empleados públicos y asociaciones benéficas.

■ La definición del término "empleado" contenida en el Art. 2 de la Ley, 29 L.P.R.A. sec. 63 (⁵) está concebida en los términos más amplios posibles, y únicamente admite como excepciones expresas la de los individuos empleados en el servicio doméstico, o en el servicio de sus padres o cónyuge, y a los ejecutivos y supervisores. Vemos, pues, que, distinto a lo que acontece en la legislación federal desde la aprobación en 1947 de la Ley Taft-Hartley (Sec. 2(3), 29 U.S.C. sec. 152(3)), nuestro estatuto no excluye en forma expresa

10. Procedimiento a seguir cuando a un cliente se le extravíe el duplicado de un cuadro o papeleta jugada.

11. Forma en que deben proceder los agentes cuando se altere un cuadro.

12. Necesidad de que los agentes entreguen su material en las cajas de metal que le han sido proporcionadas por la San Juan Racing para ese propósito.

13. Prohibición a los agentes de pagar cuadros o papeletas premiados que hayan sido jugados en otra agencia, y advirtiéndoles que de hacerlo, el agente estará sujeto a que se cancele su agencia inmediatamente.

14. Pago de cuadros o papeletas premiados que han sido comprados en otras agencias bajo ciertas condiciones.

15. Necesidad de que los cuadros y papeletas se vendan en orden numérico consecutivo.

16. Necesidad de que los agentes recojan en las oficinas del "pool" las hojas de cotejo de cuadros y papeletas del material vendido en las agencias.

17. Pago de papeletas y cuadros premiados en las oficinas del "pool".

18. Venta de dupletas en las agencias hípicas.

19. Necesidad de que el material se entregue en orden numérico consecutivo y de que los agentes cotejen las tarjetas que reciben para comprobar que estén en orden.

20. Reanudación de las conferencias semanales en la oficina del "pool".

21. Necesidad de que los agentes usen en orden numérico las tarjetas entregadas por la San Juan Racing, y advirtiendo que se exigirán responsabilidades al agente que no proceda de acuerdo con las instrucciones.

22. Información requerida a los agentes para presentar estadísticas a la Legislatura de Puerto Rico.

(⁵) "El término 'empleado' incluirá a *cualquier empleado,* y no se limitará a los empleados de un patrono en particular, a menos que la Ley explícitamente lo exprese en contrario, e incluirá a cualquier individuo

a los contratistas independientes.(⁶)   Las enmiendas incor-
poradas en la fecha indicada no se limitaron a establecer la
exclusión de los contratistas independientes de la categoría
de empleados, sino que, de acuerdo con el historial legisla-
tivo de la medida,(⁷) instruyen a la Junta federal para que
aplique las normas usuales del derecho común en el campo de
agencia para determinar la condición de empleado cubierto
por sus disposiciones o de contratista independiente.   Hasta
entonces, tanto los tribunales como la Junta se habían apar-
tado de las reglas del derecho común para hacer tal deter-
minación y se fundaban más bien en el amplio propósito de
la Ley para proteger y fomentar la negociación colectiva.
Así, en *National Labor Relations Board* v. *Hearst Publica-
tions, Inc.*, 322 U.S. 111 (1943), se enuncia el criterio de que
para resolver si una persona es o no empleado dentro del al-
cance del estatuto cobra importancia la determinación de la
posición económica en que se encuentra en relación con otra,
de forma que los fines perseguidos por el estatuto requieren
su protección; es decir, debe atenderse primordialmente a
las realidades económicas en lugar de a las clasificaciones
legales técnicas prevalecientes en el derecho común.(⁸)   Ver,
Nota en 17 Geo. Wash. L. Rev. 404 (1949).

cuyo trabajo haya cesado como consecuencia de, o en relación con cualquier
disputa obrera, o debido a cualquier práctica ilícita de trabajo . . ."

Compárese, en cuanto a la definición del término "patrono," *Junta
de Rel. del Trabajo* v. *Club Deportivo*, 84 D.P.R. 515 (1962).

(⁶) Bajo las disposiciones de la Ley Wagner tampoco se excluían ex-
plícitamente como empleados a los contratistas independientes, pero la inter-
pretación de la Junta federal fue en ese sentido. *East Shore Newspaper,
Inc.*, 55 N.L.R.B. 993 (1944); *The Kelly Co.*, 34 N.L.R.B. 325 (1941).
De las trece jurisdicciones estatales que tienen leyes locales sobre la
materia, la exclusión del contratista independiente aparece expresamente
en los estatutos de Colorado, Hawaii, Dakota del Norte, Oregón y Wisconsin.
Véase, Prentice-Hall, *Labor Relations*, State Laws, pág. 42,001 y ss.

(⁷) Véase, el escolio 11 de la opinión emitida en *National Labor
Relations Board* v. *Steinberg*, 182 F.2d 850, 854–855 (C.A. 5, 1950), en
donde se transcribe de los informes del Comité de Trabajo de la Cámara
de Representantes y del Comité de Conferencia que consideró el proyecto.

(⁸) En *Sierra* v. *Pedro A. Pizá, Inc.*, 86 D.P.R. 447 (1962), estaba en-
vuelta la determinación de si los vendedores a comisión de la querellada

El criterio aplicado en el derecho común es el de "retención de control." En *Kansas City Star Co.*, 76 N.L.R.B. 384 (1948), primer caso sobre contratista independiente resuelto por la Junta federal después de las enmiendas de 1947, dicho organismo trazó las normas a seguir para darle efectividad al propósito congresional, y en cuanto a contratistas independientes, indicó, citando del informe de la Comisión de Trabajo de la Cámara de Representantes de Estados Unidos sobre el proyecto que se convirtió en la Ley Taft-Hartley, *supra*, que comprendía a aquellas personas 1) a quienes se encomendaba la realización de una obra por una cantidad determinada; 2) deciden la forma en que se ejecutará el trabajo; 3) usualmente emplean otras personas para ello; y, 4) dependen para su ingreso, no de un salario fijo, sino del beneficio que pueda obtenerse. Véanse, *National Van Lines, Inc.* v. *N.L.R.B.*, 273 F.2d 402 (C.A. 7, 1960); *Los Angeles Evening Herald and Express*, 102 N.L.R.B. 103 (1953); *National Labor Relations Board* v. *Steinberg*, 182 F.2d 850 (C.A. 5, 1950), señala que la relación de patrono y empleado existe únicamente cuando aquél retiene el control en la ejecución de la obra, no sólo en cuanto al resultado final, sino también respecto a la forma y medios para lograr tal resul-

---

tenían derecho bajo los decretos de salario mínimo aplicables a disfrutar de vacaciones con paga. La defensa interpuesta señalaba que la relación existente era la de principal y contratistas independientes. Al rechazar esta contención advertimos que "Ante todo, conviene anticipar que el concepto tradicional del derecho común sobre los rasgos característicos de un contratista independiente no tiene lugar de aplicación estricta en la interpretación de estatutos reguladores de salarios mínimos y condiciones de trabajo."

Por otro lado, a los fines de la fijación de responsabilidad civil en acciones de daños y perjuicios hemos adoptado las normas del derecho común de agencia en cuanto a contratistas independientes, *Bonet* v. *Municipio de Barceloneta*, 87 D.P.R. 81 (1963); *Morales Muñoz* v. *Castro*, 84 D.P.R. 288 (1962); *Mariani* v. *Christy*, 73 D.P.R. 782, 796–799 (1952). En igual forma, en materia de compensación por accidentes del trabajo, *Atiles, Admor.* v. *Comisión Industrial*, 68 D.P.R. 115 (1948); *Atiles, Admor.* v. *Comisión Industrial*, 63 D.P.R. 597 (1944); *Montaner* v. *Comisión Industrial*, 59 D.P.R. 285 (1941); *Romero* v. *Comisión Industrial*, 57 D.P.R. 354 (1940).

tado. Véanse, además, *United Insurance Company of America* v. *N.L.R.B.*, 304 F.2d 86 (C.A. 7, 1962) ; *A. S. Abell Co.*, 137 N.L.R.B. No. 36 (1962) ; *Mound City Yellow Cab Co.*, 132 N.L.R.B. 484 (1961) ; *Lindsay Newspapers, Inc.*, 130 N.L.R.B. 680; *Buffalo Courier-Express, Inc.*, 129 N.L.R.B. 932 (1960) ; *American Broadcasting Co.*, 117 N.L.R.B. 13 (1957) ; *The H. E. Koontz Creamery, Inc.*, 102 N.L.R.B. 1619 (1953) ; *Golden State Agency, Inc.*, 101 N.L.R.B. 1775 (1952) ; *Oklahoma Trailer Convoy, Inc.*, 99 N.L.R.B. 1019 (1952). [9]

De acuerdo con las interpretaciones en casos federales, para resolver si se trata de un contratista independiente o de un empleado se han considerado diversos factores: a) el grado de control en la ejecución de la labor, *N.L.R.B.* v. *Nu-Car Carriers, Inc.*, 189 F.2d 756 (C.A. 3, 1951) ; *Golden Age Dayton Corp.*, 124 N.L.R.B. 916 (1959) ; *Serv-Us Bakers of Oklahoma*, 121 N.L.R.B. 84 (1958) ; *Albert Lea Cooperative Creamery Ass'n*, 119 N.L.R.B. 817 (1957) ; y los casos citados en el párrafo anterior; b) la forma de compensación, *N.L.R.B.* v. *NuCar Carriers, Inc.*, supra; *La Prensa, Inc.*, 131 N.L.R.B. 527 (1961) ; c) la facultad de emplear y el derecho a despedir, *Ivory Pine Co. of California*, 107 N.L.R.B. 19 (1953) ; *San Marcos Telephone Co.*, 81 N.L.R.B. 314 (1949) ; d) la oportunidad de beneficio y el riesgo de pérdida, *Site Oil Co. of Missouri*, 137 N.L.R.B. No. 145 (1962) ; *Island Services Ltd.*, 50 L.R.R.M. 1213 (1962) ; *Air Control Products*, 132 N.L.R.B. 114 (1961) ; e) la propiedad del equipo y dependencia en las facilidades suministradas por el principal, *Island Services Ltd.*, supra; *Malone Freight Lines, Inc.*, 107 N.L.R.B. 501 (1953) ; *Eldon Miller, Inc.*, 107 N.L.R.B. 557 (1953) ; f) la retención de contribuciones, *Coca Cola*

---

[9] La caracterización o denominación que hagan las partes respecto a la naturaleza del contrato no es decisiva. *National Labor Relations Board* v. *Keystone Floors, Inc.*, 306 F.2d 560 (C.A. 3, 1962). *American Broadcasting Co.*, 117 N.L.R.B. 13 (1957); *Eldon Miller, Inc.*, 107 N.L.R.B. 557 (1953); cfr. *Cassasús* v. *Escambrón Beach Hotel*, 86 D.P.R. 375 (1962).

*Bottling Co.,* 133 N.L.R.B. 762 (1961) ; *American Broadcasting Co.,* supra.

■ Sin embargo, no puede afirmarse que un factor en particular sea decisivo, ni que exista una fórmula uniforme que se aplique fácilmente para llegar a la conclusión deseada. Es preciso escrutar cuidadosamente el cuadro general de los hechos y, en fin de cuentas, recurrir al criterio talismánico que impera en este campo, el de retención de control. *United Insurance Company of America* v. *N.L.R.B.,* 304 F.2d 86 (C.A. 7, 1962) ; *N.L.R.B.* v. *Blount,* 131 F.2d 585 (C.C.A. 8, 1942). Precisamente la parte recurrente dedica la mayor parte de su elaborado alegato a analizar separadamente cada uno de los factores en que se basó la Junta y a señalar—sostenida por interpretaciones de la Ley federal—que la ausencia o presencia de cada factor individual no detrae de la condición de empleado. No obstante, repetimos que el enfoque correcto es considerar el conjunto de circunstancias, pues salvo en raras ocasiones, no puede establecerse con certeza infalible una tajante distinción entre el empleado y el contratista independiente. Normalmente en esta clase de relaciones se acusan indistintamente características de una y otra clasificación. Es por eso que es preciso recurrir al análisis de todas las circunstancias para lograr formar el juicio que se acerque más a la realidad.

Independientemente de la determinación sobre "retención de control" que es necesario hacer, una de las peculiaridades que contribuye a complicar la resolución del presente caso consiste en la intervención del poder regulador del Estado, a través de la reglamentación aprobada por la Comisión Hípica para regir distintas fases del deporte hípico, en la relación existente entre la empresa propietaria del hipódromo y los agentes hípicos. Esta intervención se manifiesta precisamente en áreas de señalada importancia, como la relacionada con la designación y sustitución de los agentes, la fijación de la compensación que éstos devengarán, la prestación de fianza

por los agentes para la protección de los intereses de la empresa, y la fijación de la cantidad que la empresa cobrará a los agentes por los impresos de cuadros, papeletas y quinielas. En cuanto a estos particulares, el Reglamento Hípico en vigor para la fecha en que tuvieron lugar los hechos que dieron margen a las querellas, disponía que la persona natural o jurídica que operare un hipódromo podía designar agentes, pero tales nombramientos estaban sujetos a la aprobación de la Comisión (15 R.&R.P.R. secs. 184–312(b) y 184–360); que la entidad explotadora del hipódromo no podía "cerrar" ninguna de las agencias existentes sin la previa autorización de la Comisión (15 R.&R.P.R. sec. 184–312(b)); que los agentes percibirían como remuneración una comisión "que de tiempo en tiempo" fijaría la Comisión de acuerdo con las circunstancias "siendo en todo caso dicha comisión un por ciento del valor total de las combinaciones que dicho agente o agentes sellen en sus respectivas agencias" (15 R.&R.P.R. sec. 184–315); que, a solicitud de la empresa, el organismo rector del deporte hípico podía fijar, previa la celebración de una vista pública, una fianza para ser prestada por los agentes "para la protección de sus intereses" (15 R.&R.P.R. sec. 184–318); que el precio a cobrarse por los impresos de cuadros, papeletas y quinielas podía fijarse por la propietaria del hipódromo y los agentes, sujeto a la aprobación de la Comisión (15 R.&R.P.R. secs. 184–361, 184–362 y 184–415); y, finalmente, se imponía a los agentes las obligaciones de dar cuenta de todos los impresos que se les entregaran y de devolver los impresos nulos (15 R.&R.P.R. sec. 184–415).

El Reglamento Hípico de 1962 (10) amplía aun más la participación de los organismos que dirigen el deporte hípico—la Junta Hípica y el Administrador—en las relaciones existentes entre la San Juan Racing Association, Inc., y los agen-

(10) Aprobado por la Junta Hípica en 14 de diciembre de 1961; por el Gobernador, en 23 de febrero de 1962; y radicado en el Departamento de Estado en 2 de abril de 1962, fecha desde la cual está en vigor.

tes hípicos. En adición a las situaciones señaladas en el párrafo anterior que se conservan sustancialmente en la reglamentación vigente, (11) se provee expresamente que no sólo la designación y retiro de los agentes estará sujeta a la aprobación del Administrador, sino también la suspensión de éstos y la transferencia de agencias (Art. 602); se impone a la empresa la obligación de suministrar a los agentes todo el material necesario para las apuestas, tales como cuadros, papeletas, hojas de inscripción y programas oficiales, y en caso de conflicto, el Administrador determina las necesidades de la agencia (Art. 603); se confiere al Administrador la facultad de fijar la hora de cierre para las jugadas en las agencias (Art. 606); se autoriza al Administrador, a petición de cualesquiera de las partes a revisar los cargos y cantidades que la empresa cobra a los agentes por el material y uso del equipo para las apuestas y el juego de la quiniela (Arts. 609 y 708); y se requiere a los agentes para que rindan cuenta de los impresos que se les entreguen (Arts. 628 y 709).

█ Finalmente, examinemos las expresiones de nuestra Junta de Relaciones del Trabajo en las situaciones en que se ha planteado la cuestión relativa a contratistas independientes. (12) En *Buena Vista Dairy, Inc.*, D–174 (res. en 20 de noviembre de 1957), a pesar de que en la exposición inicial se hace referencia al criterio enunciado en el caso de *Hearst Publications, Inc.*, supra, y de que se afirma que "La Junta, al descargar la responsabilidad de definir los términos 'patrono' y 'empleado', ha de ponderar las realidades económicas a la luz de los objetivos que la Asamblea Legislativa se propuso realizar y ha de evitar que los patronos, al crear la rela-

---

(11) Arts. 602 (sobre designación y retiro de agentes), 604 (sobre fijación de compensación o comisión), y 610 (sobre prestación de fianza).

(12) En los casos de los ayudantes de banqueros de juego (*croupiers*) no se planteó la cuestión de si eran contratistas independientes. *Hilton Hotels International, Inc.*, D-167 (res. en 18 de marzo de 1957); *San Juan Intercontinental Hotel*, D-193 (res. en 17 de septiembre de 1958).

ción con las personas que les ayudan en la producción y distribución, utilicen tecnicismos legales para situar fuera de la protección de la Ley a la que de otra suerte son empleados," resuelve que los vendedores de leche de la empresa son empleados porque "ejerce sobre ellos *un grado de control* casi tan amplio como el que tiene sobre los demás choferes y retiene el poder de aplicarles medidas disciplinarias," y seguidamente examina una serie de factores para determinar la extensión de este grado de control. En *Asociación Hípica de Puerto Rico*, D–190 (resuelto en 3 de septiembre de 1958), se planteó si los jinetes se consideran contratistas independientes en sus relaciones con los dueños de caballos. Al desestimar esta alegación de los querellados, la Junta indicó que "Para resolver si una persona es o no un empleado dentro del alcance del estatuto, lo importante es determinar si está en una posición económica en relación con otra en que los fines que persigue la Ley requieren su protección (cita). Contrario a lo que sostienen los patronos, el hecho de que una persona sea un contratista independiente de acuerdo con los criterios convencionales no le excluye automáticamente de la protección de la Ley de Relaciones del Trabajo," y aplicando tanto el criterio de "retención de control" como el de "posición económica," resolvió que los jinetes eran empleados cubiertos por la ley. En cuanto a este último aspecto, se indicó que existía una "marcada desigualdad" en la capacidad de negociar sobre salarios y otras condiciones de trabajo entre los jinetes y los dueños de caballos, y que, no empece la existencia de disposiciones reglamentarias garantizando una compensación mínima a aquellos que no finalizan dentro de los primeros cinco puestos, en la realidad no recibían pago alguno; que, respecto a sus ingresos, los jinetes dependen de los dueños de caballos en igual forma que cualquier otro empleado, y, por tanto, el derecho a organizarse para negociar era esencial en su caso.

■ Aceptando a los fines del presente recurso la interpretación administrativa sobre el alcance de la definición del término empleado, debemos resolver, a la luz de lo expuesto anteriormente, a) si los agentes hípicos son contratistas independientes en relación con la empresa operadora del hipódromo; y, b) en caso afirmativo, si, aun tratándose de contratistas independientes, se justifica en su caso la extensión de los beneficios de la aplicación de la Ley debido a su "posición económica" frente a dicha empresa. A este respecto, merece nuestra deferencia y consideración la determinación que sobre ambas cuestiones hizo la junta recurrida. *Junta Rel. Trabajo* v. *Club Deportivo*, 84 D.P.R. 515 (1962); *Junta de Relaciones del Trabajo* v. *Junta Administrativa del Muelle*, 71 D.P.R. 154 (1950); *N.L.R.B.* v. *E. C. Atkins Co.*, 331 U.S. 398 (1947). Cfr. *South P. R. Sugar Co.* v. *Junta Azucarera*, 82 D.P.R. 847, 864 (1961).

■ Apreciadas todas las circunstancias en conjunto, no hay duda alguna de que la empresa retiene algún grado de control de la actividad de los agentes hípicos, pero estos elementos no son suficientes para colocarlos en la categoría de empleados. Según atinadamente observa la Junta, las instrucciones escritas trasmitidas a los agentes tienen los propósitos definidos de lograr la uniformidad en la apariencia física de los locales, una mayor eficiencia y prontitud en la operación del negocio debido al sistema mecanizado del "pool" y una mayor protección al público para despertar la confianza de los apostadores. "Con ello se controla el resultado final y no el medio," dice la decisión, criterio que compartimos. Por otro lado, los elementos principales tienden a señalar la ausencia de control efectivo: no existe la facultad ilimitada para designar o suspender los agentes, no hay determinación del ingreso de éstos o de las condiciones básicas de trabajo, ni de su tiempo o actividad personal, no hay intervención en las pérdidas que puedan ocurrir en la operación de las agencias, y otros. Forzoso es concluir que la posición adop-

tada por la Junta al clasificar como contratistas independientes tiene suficiente fundamento.

Establecido el hecho de que los agentes son contratistas independientes, réstanos considerar. si aplicando el criterio de "posición económica" es preciso reconocerles la protección que concede la ley. En verdad no es fácil delimitar los contornos de este concepto, pero, consideradas las expresiones del caso *Hearst*, podemos afirmar que esencialmente envuelve una situación de dependencia económica de forma que, en efecto, el principal prácticamente controla el importe que se recibe por el trabajo realizado. En otras palabras, la determinación del ingreso del contratista independiente descansa casi exclusivamente en la discreción del principal. La Junta señala que esta situación no está presente en el caso de los agentes hípicos. Dice: "La querellada no controla el ingreso de los agentes hípicos. La comisión a que tienen derecho es reglamentada por la Comisión Hípica [hoy, la Junta Hípica]. No se les fija un límite de ventas ni tienen que dedicar todo su tiempo al negocio de agencia. De hecho, el récord revela que alrededor de un 75% de los agentes hípicos se dedican a otras actividades lucrativas." Consideradas todas las circunstancias, no podemos sostener que los hechos revelen una situación de desvalimiento y desamparo que requiera la aplicación de la ley, especialmente considerando que los principales aspectos se hallan intervenidos por la reglamentación de otra agencia estatal con el propósito afín de brindar la debida protección a todas las partes interesadas.

Las conclusiones a que hemos llegado hacen innecesario resolver la cuestión jurisdiccional planteada. No obstante, véanse, *Walter A. Kelley*, 139 N.L.R.B. No. 56 (1962); *Meadow Stud, Inc.*, 130 N.L.R.B. 1202 (1961); *Hialeah Race Course, Inc.*, 125 N.L.R.B. 388 (1959); *Los Angeles Turf Club, Inc.*, 90 N.L.R.B. 20 (1950); cfr. *P. R. Telephone* v. *Junta Rel. Trabajo*, 86 D.P.R. 382 (1962).

Hábil ha sido la presentación del punto de vista de los recurrentes; valiosa, la de la Junta y la interventora.

*Se confirmará la orden dictada por la Junta de Relaciones del Trabajo en 25 de febrero de 1960.*