Ramón Bonet, etc., demandantes y recurrentes, *v.* Municipio de Barceloneta, etc., et al., demandados y recurridos.

Número: 365    Resuelto: 18 de enero de 1963

*G. R. Padró Díaz,* abogado de los recurrentes; *J. B. Fernández Badillo, Procurador General,* y *Nilita Vientós Gastón, Procurador General Auxiliar,* abogados del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Al disponer para la celebración de las tradicionales fiestas patronales en honor de la Virgen del Carmen, la Asamblea Municipal de Barceloneta autorizó al Alcalde para que procediera a la contratación de un pirotécnico para la quema de fuegos artificiales y cohetes de bomba durante las festividades. Específicamente se facultó al ejecutivo municipal para que determinara los sitios en que se verificaría el espectáculo, pero se dispuso que los actos se llevarían a cabo bajo la supervisión personal del pirotécnico y del Servicio Estatal de Bomberos. Se indicó que el lanzamiento de cohetes podía hacerse entre ocho de la mañana y diez de la noche para señalar el comienzo de cada día de fiesta y su terminación o el de actividades a celebrarse durante las fiestas.[1]

---

[1] La Sec. 6 de la Ley Núm. 71 de 26 de abril de 1940, 33 L.P.R.A. sec. 1448, autoriza a los municipios para reglamentar el uso de cohetes de bomba desde las ocho de la mañana y hasta las diez de la noche.

La Sec. 1 de la Ley Núm. 82 de 4 de mayo de 1948, 25 L.P.R.A. sec. 497, prohibe la manufactura, posesión, uso, venta y transportación de petardos, garbanzos, triquitraques, buscapiés y otros similares.

Finalmente, se instruyó para que se observara especial cuidado de que los cohetes fueran lanzados al espacio en forma en que en su ascenso no tropezaran con objeto alguno, considerando la dirección del viento y condiciones atmosféricas para lograr un ángulo de inclinación que impidiera ocasionar daños a personas o propiedades.

En cumplimiento de la ordenanza cuyos términos pertinentes han sido reseñados, el alcalde celebró un contrato con el señor Guillermo Rivera, un pirotécnico de cerca de cuarenta años de oficio, mediante el cual por la cantidad de $863.00 éste se obligó a suministrar y quemar los fuegos artificiales durante las fiestas patronales.([2])    Rivera había prestado este mismo servicio al municipio durante varios años.    El contratista proporcionó el equipo y el personal necesario para la actividad, la cual se encontraba bajo su control exclusivo.

El espectáculo se celebró en la plaza pública de la localidad.    Mediante el uso de altoparlantes se advirtió al público sobre "los peligros de la quema de fuego," y se requirió a los concurrentes para que se situaran a una distancia no menor de treinta pies del lugar en que se efectuaba la quema de los fuegos artificiales.    Además, se advirtió a los funcionarios y empleados de la Defensa Civil, la Policía Estatal y Servicio de Bomberos para que estuvieran alertas y mantuvieran el orden.

Precisamente el último día de las festividades del año 1957, la joven Freddy Bonet Galán, quien contaba diecinueve años de edad, asistió al espectáculo que para deleite del público se efectuaba en la plaza pública.    Como parte de los festejos se quemó un cuadro que consistía de varias ruedas

---

([2]) En el contrato se especificaron los fuegos artificiales a quemarse o detonarse: cohetes de bomba, cohetes de fantasía, cuadros, cintas luminosas, ruedas dobles y otras variedades de las que usualmente se presentan en las tradicionales fiestas patronales que se celebran en la mayoría de los municipios del país.

que giraban al encenderse. Una de las ruedas se desprendió, cayó al suelo y rodó, e hizo contacto con la pierna izquierda de la joven mencionada, causándole quemaduras. Representada por su padre con patria potestad, incoó demanda en reclamación de los daños sufridos contra el Municipio de Barceloneta y el pirotécnico Rivera. El tribunal de instancia declaró con lugar la demanda contra este último y absolvió de responsabilidad al municipio por entender que existía la relación de principal y contratista independiente.[3]   Para revisar la sentencia[4] dictada expedimos el auto correspondiente.

El único error que se plantea se refiere a la responsabilidad del municipio, pues aunque se admite reiteradamente que Rivera era un contratista independiente, se señala que por tratarse de una actividad inherentemente peligrosa o de un deber indelegable, la existencia de la relación indicada no inmuniza al municipio contra la reclamación.

■ Al adoptar la doctrina prevaleciente en Estados Unidos cuando media la relación de patrono y contratista independiente, dijimos en *Mariani* v. *Christy*, 73 D.P.R. 782, 803 (1952), que "un patrono es responsable por los actos torticeros de un contratista independiente si los daños causados constituyen un resultado directo y necesario del trabajo es-

---

[3] La décima determinación de hechos dice así: "Que todo el trabajo de la quema y lanzamiento de los fuegos, durante las fiestas y en particular el día 20 de julio de 1957, era hecho por el Sr. Rivera y sus empleados; que todo el equipo lo suplía Rivera; que todos los empleados que tomaban parte en los fuegos eran empleados de Rivera; que estaban bajo el control exclusivo de Rivera y eran pagados por éste; que Rivera controlaba los medios y maneras de hacer el trabajo; que Rivera suplía todos los materiales y el acuerdo con él se había hecho por una suma global, específica; que los empleados de Rivera recibían órdenes únicamente de Rivera y no del Alcalde o funcionarios municipales; que ningún empleado, agente o funcionario municipal intervino en la quema y lanzamiento de fuegos ni la noche de los hechos ni en ningún momento durante las fiestas."

[4] El tribunal concedió a la menor una indemnización de $5,000; a sus padres, $2,000; y $800 para honorarios de abogado.

tipulado, o sea, si el trabajo a ser realizado no puede ser hecho sin peligros o daños a terceras personas y si ese trabajo, por su propia naturaleza y existencia, necesariamente tiene que causar o producir peligros o daños. En ese caso los daños se producen, no debido a la manera en que se hace el trabajo, sino al hecho en sí de que se hace el trabajo." Véase, *Morales Muñoz* v. *Castro*, 85 D.P.R. 288 (1962). Respecto a este particular el tribunal a quo expresamente concluyó que "no se trata aquí de un trabajo que necesariamente y por su propia naturaleza vaya a producir daños, sino de un trabajo que puede producir daño por la forma en que se realice." Esta determinación tiene no sólo apoyo en la prueba practicada, sino en la experiencia diaria y las interpretaciones de los tribunales. Así, es pertinente el testimonio del pirotécnico, quien a preguntas del abogado de la parte recurrente, dijo:

"¿Dígame, estos fuegos artificiales que se quemaron allí, o los fuegos artificiales en general que están hechos de pólvora, son peligrosos?
*Siempre y cuando en la forma en que se usen.*
¿Si no están bien preparados son peligrosos?
Sí, señor.

. . . . . . . .

¿Son peligrosos?
Siempre y cuando *en la forma que se usen pueden ser peligrosos.*

. . . . . . . ."

En el *Restatement* (*Second*), *Torts* sec. 416 (Anteproyecto Núm. 7, abril 16 de 1962) se desarrolla el mismo concepto a que hemos venido haciendo referencia, exponiéndose la regla general en las siguientes palabras: "Una persona que emplea un contratista independiente para una obra en cuya ejecución pueda reconocerse la posibilidad de la creación de un riesgo peculiar de daños físicos a terceros a menos que se adopten precauciones especiales, es responsable por los perjuicios causados por la omisión del contratista de desplegar

el cuidado razonable de tomar tales precauciones." ([5]) Como se indica en la anotación 3 que acompaña al texto transcrito no es suficiente que se anticipe cualquier daño que pueda sobrevenir si el contratista es en alguna forma negligente, ya que esto es así en relación con cualquier gestión encomendada a un tercero. Los elementos claves son el "riesgo peculiar" y "las precauciones especiales," y de todas formas, no incluye lo que se denomina "negligencia colateral," que consiste únicamente—como en el presente caso—de la forma impropia o inadecuada en que se ejecuta la obra o el trabajo y que crea un riesgo de daños que el patrono no podía razonablemente prever, si la gestión encomendada se realiza en la manera usual y corriente. Dicho más explícitamente, se requiere que el patrono anticipe la actuación negligente del contratista con respecto a todos los riesgos que son inherentes en la ejecución normal y usual del trabajo dentro de las circunstancias específicas que concurran mas no la actuación negligente o descuidada en los detalles de la ejecución que usualmente se espera se realicen con la debida circunspección. Véase, *Restatement, op. cit.*, sec. 426, comentario (b) ; Harper y James, *The Law of Torts* (ed. 1956), vol. 2, págs. 1406–1410; Smith, *Collateral Negligence*, 25 Minn. L. Rev. 399 (1941). ([6])

■ La obligación de un empresario o promotor de un espectáculo como el envuelto en el presente caso se limita

---

([5]) El texto inglés lee como sigue: *"Work Dangerous in Absence of Special Precautions*—One who employs an independent contractor to do work, which the employer should recognize as likely to create a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions."

([6]) Compárense, *Pickett* v. *Waldorf System*, 136 N.E. 64 (Mass. 1922), con *Wright* v. *Tudor City Twelfth Unit*, 12 N.E. 2d 307 (N.Y. 1938) ; *Giem* v. *Williams*, 222 S.W.2d 800 (Ark. 1949), con *McNamee* v. *Hunt*, 87 Fed. 298 (C.C.A. 4, 1898) ; *Philadelphia, B. & W. R. Co.* v. *Mitchell*, 69 Atl. 422 (Md. 1908), con *Hyman* v. *Barrett*, 121 N.E. 271 (N.Y. 1918) ; y *Pye* v. *Faxon*, 31 N.E. 640 (Mass. 1892), con *Strauss* v. *City of Louisville*, 55 S.W. 1075 (Ky. 1900).

1) a proporcionar un sitio, seguro a los espectadores para presenciar el espectáculo; y 2) a seleccionar una persona diestra para ello. *Sebeck* v. *Plattdeutsche Volksfest Verein*, 124 Fed. 11 (C.C.A. 2, 1903), 46 Atl. 631 (1900); *Blue Grass Fair Assn'n* v. *Bunnell*, 267 S.W. 237 (Ky. 1924); *Reisman* v. *Public Service Corporation*, 81 Atl. 838 (1911); *Deyo* v. *Kingston Consol. R. Co.*, 88 N.Y.S. 487 (1904). En *Sebeck* se indicó que si la explosión prematura se debe a un defecto de construcción que no puede determinarse por una simple inspección o a la forma en que se manipulan los fuegos artificiales, el empresario no es responsable, pues su obligación se limita a hacer una selección adecuada de la persona que ha de suministrarlos y quemarlos; *Deyo* se manifiesta en igual sentido; y en *Blue Grass*, aunque se habla de deber indelegable, ello se refiere al de proporcionar un sitio seguro a los asistentes, y se llega tan lejos como afirmar que la selección adecuada del operador de los fuegos releva de responsabilidad aunque se trate de una obra inherentemente peligrosa. Aplicada la norma expuesta a los hechos del presente caso es inevitable concluir que el municipio cumplió en forma adecuada su obligación para con los concurrentes, ya que la prueba revela en forma incontrovertida que empleó como contratista a una persona diestra y de reconocida experiencia, y además proporcionó un sitio razonablemente seguro a la concurrencia para presenciar las festividades, asegurándose además mediante la intervención de la policía, los bomberos y los empleados de la defensa civil que se mantuvieran a prudente distancia del lugar en donde se quemaron los fuegos y detonaron los cohetes.

Tanto en *Doughty* v. *Atlantic City Business League*, 80 Atl. 473 (N.J. 1911), como en *Speir* v. *City of Brooklyn*, 34 N.E. 727 (N.Y. 1893), se reafirma la regla de que la obligación del empresario es proporcionar un sitio razonablemente seguro a los espectadores para presenciar el espectáculo, y se enuncia que la omisión de hacerlo constituye un

estorbo, que da margen a responsabilidad civil. Se trataba en dichos casos de un espectáculo que se presentó en un solar sin edificar sito en un lugar poblado. Estas circunstancias tampoco concurren en el presente caso.

■ La parte recurrente insiste en que determinemos que la quema de fuegos artificiales es *per se* una actividad inherentemente peligrosa. Como advertimos precedentemente, ni la experiencia diaria ni las interpretaciones de otros tribunales justifican una afirmación tan abarcadora. *Crowley* v. *Rochester Fireworks Co.*, 76 N.E. 470 (N.Y. 1906); *Bianki* v. *Greater American Exposition Co.*, 92 N.W. 615 (1902); *Blue Grass Fair Ass'n* v. *Bunnell*, supra, en donde se dijo a la pág. 240:

"Un determinado acto o trabajo que usualmente no es peligroso (inherente o intrínsecamente) puede, en ausencia de precaución, convertirse en una fuente probable o necesaria de peligro por mor de su situación y de las circunstancias concurrentes al momento en que se ejecuta.

"Por ejemplo: Fuegos artificiales corrientes, luces de bengala, cohetes o bajo algunas circunstancias aun los triquitraques, de quemarse cerca del público en una calle o en un parque, probable y necesariamente resultarían peligrosos, constituirían un estorbo, y una infracción de la ley, y por ende caerían dentro de las clases prohibidas mencionadas precedentemente.

"Por otro lado, si estos mismos explosivos o algunos de más potencia fueren quemados en un lugar tan lejos de los espectadores que elimine cualquier sospecha de peligro, y cuando se les ha dado aviso a los espectadores del lugar en que deben colocarse y advertido de los lugares de peligro, no podría haber duda en cuanto al derecho del dueño de otorgarle el contrato a un tercero; y si éste empleó el debido cuidado al así hacerlo, el dueño no sería responsable por la negligencia de dicho contratista."

Y en la opinión emitida en el reciente caso de *Haddin* v. *Lotito*, 161 A.2d 160 (Pa. 1960), se dice inequívocamente

que "un espectáculo de fuegos artificiales, operado por una persona competente en un lugar relativamente seguro y adecuadamente supervisado, no es una actividad [inherentemente] peligrosa." Véase, comentario en 34 Temp. L. Q. 71 (1960).

Al resolver el presente recurso no podemos hacer caso omiso de las desgracias ocurridas por el manejo de luces de bengala durante la pasada Navidad que causaron la muerte de varios niños y produjeron lesiones graves a otros. Sin embargo, por lo que se ha discutido, no podemos sostener como proposición de derecho que los fuegos artificiales, dentro de las circunstancias del presente caso, sean una actividad inherentemente peligrosa. Aclaramos, no obstante, que no estamos resolviendo sobre la responsabilidad que pueda recaer sobre la persona que vende o suministra estos artefactos a niños de tierna edad o incapaces de comprender el riesgo normal envuelto en su manipulación. Véanse, *Pierson* v. *London*, 156 Atl. 719 (Pa. 1931); *Burbee* v. *McFarland*, 157 Atl. 538 (Conn. 1931); *Victory Sparkler & Specialty Co.* v. *Price*, 111 So. 437 (Miss. 1927); *Bosserman* v. *Smith*, 226 S.W. 608 (Mo. 1920); *Schmidt* v. *Capital Candy Co.*, 166 N.W. 502 (Minn. 1918); cfr. *Allen* v. *Gornto*, 112 S.E.2d 368 (Ga. 1959). Tampoco estamos resolviendo ni anticipando criterio alguno sobre la facultad de la Asamblea Legislativa, en el ejercicio de su poder policíaco, para reglamentar la venta, uso o disposición de fuegos artificiales.

No incurrió en error el tribunal de instancia al exonerar de responsabilidad al municipio demandado. *Se anulará el auto expedido y se confirmará la sentencia dictada por el Tribunal Superior, Sala de Arecibo, en 7 de julio de 1960.*

El Juez Presidente, Señor Negrón Fernández, disintió.