RAMONITA BARRIENTOS ET AL., demandantes y recurridos, *v.* GOBIERNO DE LA CAPITAL ET AL., demandados y recurridos; ISLAND CONSTRUCTORS, INC., ET AL., demandadas y recurrentes; CARMEN J. MARTÍNEZ CANCEL ET AL., demandantes y recurrentes, *v.* GOBIERNO DE LA CAPITAL ET AL., demandados y recurridos; JOAQUÍN VALDIVIESO LLOMPART ET AL., demandantes y recurrentes, *v.* NOLLA, GALIB & CO. ET AL., demandados y recurridos; CÉSAR MALDONADO ET AL., demandantes y recurrentes, *v.* GOBIERNO DE LA CAPITAL ET AL., demandados y recurridos; LEÓN LYON y AURIS M. GIRONA, demandantes y recurridos, *v.* GOBIERNO DE LA CAPITAL ET AL., demandados y recurridos; ISLAND CONSTRUCTORS, INC., ET AL., demandadas y recurrentes; LA SOCIEDAD DE BIENES GANANCIALES constituida por HERIBERTO BERLY y JULIA COLÓN, demandantes y recurridos, *v.* NOLLA, GALIB & CO. ET AL., demandados y recurridos; ISLAND CONSTRUCTORS, INC., ET AL., demandadas y recurrentes.

*Números:* R-62-61, 156, *Resueltos:* 27 de junio de 1969
R-62-67 a 69,
R-64-188, R-64-214

*Castro & Castro,* abogados de la demandada Island Construc-
tors, Inc. y su aseguradora American Surety Co. of N.Y.,
recurrentes; *Picó & Rosa Silva, J. R. Lebrón Velázquez* y
*Benigno Dapena Yordán,* abogados del demandado Gobierno

de la Capital; *Jorge Souss,* abogado de la demandada Nolla, Galib & Co.; *Emilio de Aldrey,* abogado de U.S. Casualty Co., aseguradora de Nolla, Galib & Co.; *Martínez-Muñoz, Agrait-Oliveras & Otero, Edelmiro Martínez Rivera, Edelmiro Martínez, Jr.,* abogados de los demandantes-recurrentes; *R. Elfren Bernier, Ramos & Latoni, Rodríguez Ema & Rodríguez Ramón, Julio Suárez Garriga, José N. Moreno, José M. Ramos, J. Pedro Miranda, Carmelo Ávila Medina, Juan Rivera Santiago, Luis Sánchez Vilella, George Weasler, Rafael Martínez Álvarez, Jr.,* y *Guillermo Bauzá,* abogados de los otros demandantes.

El Juez Asociado Señor Torres Rigual emitió la opinión del Tribunal.

### Los Hechos

A principios de 1957 el Municipio de San Juan contrató con Nolla, Galib & Co., previa subasta celebrada al efecto, la construcción de un sistema de alcantarillado y una casa de bombas en el sector de Ocean Park de Santurce por la cantidad de $433,241.48. Nolla y Galib subcontrataron con la recurrente, Island Constructors, Inc., la ejecución de la parte del contrato relativo a la instalación del alcantarillado pluvial por la suma de $199,322.60 reservándose para sí la construcción de la casa de bombas. El Municipio aprobó este subcontrato.

Como es natural en estas clases de transacciones, tanto el contratista como el subcontratista afianzaron el fiel cumplimiento del contrato y el pago de los materiales y mano de obra. También obtuvieron pólizas de responsabilidad para responder de los daños que se causaren en la ejecución de la obra.

El contrato requería que los tubos se instalaran en seco a una profundidad de alrededor de ocho pies. Los planos indicaban que el nivel freático en ese sector se encontraba a una distancia de cerca de dos pies de la superficie de la calle. También indicaban que el subsuelo estaba compuesto

de una capa de materia turbosa (*peat*) que fluctuaba entre seis y ocho pies y otra capa inferior compuesta de arena fina hasta una profundidad de alrededor de 21 a 23 pies. La consistencia de este subsuelo fue descrita muy apropiadamente por el ingeniero-inspector del Municipio como *insegura*.

Para llevar a cabo la instalación de la tubería en seco, Island Constructors, Inc., intentó utilizar el sistema de pozos-taladros (*well points*) con el propósito de extraer el agua del subsuelo. Instaló una hilera de alrededor de 120 pozos-taladros a una profundidad aproximada de diez pies a lo largo de la Calle Cacique desde su intersección con la Calle Santa Ana hasta su intersección con la Calle Santa Cecilia.

El sábado 30 de marzo de 1957, Island Constructors, Inc., efectuó una prueba de este sistema que duró entre dos y cuatro horas. Dicha prueba redujo el nivel freático en tal forma que provocó un asentamiento del terreno en un radio de acción de alrededor de 1,000 pies. Este asentamiento causó de inmediato el agrietamiento de aceras, paredes, verjas y el hundimiento de pisos en la vecindad. Posteriormente se fueron manifestando daños similares en las propiedades ubicadas dentro del radio de acción.

En vista de lo sucedido, y por instrucciones de los inspectores del Municipio, Island Constructors, Inc., suspendió los trabajos reanudándolos a instancia de la fiadora American Surety Co. que temía la confiscación de la fianza.[1]

Finalmente, Island Constructors, Inc., abandonó la ejecución de la obra haciéndose cargo de su continuación su fiadora American Surety Co. a base de una estipulación que acordó con Nolla, Galib & Co. como parte de una acción

---

[1] Es innecesario relacionar los incidentes relativos a la suspensión y reanudación de la obra, así como la adopción de un nuevo método para la instalación de los tubos y el cambio del sistema de pozos-taladros al de extracción de agua por bombeo desde trinchera abierta, ya que en nada alteran la adjudicación de responsabilidad en el caso.

judicial que ésta había iniciado para el cumplimiento específico del subcontrato. ([2])

Los anteriores hechos dieron motivo a una extensa y compleja litigación que culminó en la sentencia que es objeto de los recursos de revisión que aparecen relacionados en el epígrafe. Dicha sentencia declaró con lugar la demanda contra las recurrentes, Island Constructors, Inc., y su aseguradora American Surety Co. of New York; declaró sin lugar la demanda en cuanto a los demandados Nolla, Galib & Co., Gobierno de la Capital, U.S. Casualty Co., Pedro Tejada y P. J. Tejada Associates. También la sentencia declaró sin lugar las reclamaciones contra coparte formuladas por el Gobierno de la Capital contra Nolla, Galib & Co. e Island Constructors, Inc., así como la demanda contra tercero presentada por Island Constructors, Inc., contra Gabriel Fuentes. ([3])

A los fines de facilitar las discusiones de las diversas y complejas cuestiones que plantean dichos recursos, agruparemos los señalamientos que guardan relación entre sí, y así agrupados, los discutiremos.

---

([2]) Caso Civil Núms. 57 y 6515 radicada en el Tribunal Superior, Sala de San Juan, por Nolla, Galib & Co. contra Island Constructors, Inc., y American Surety Co.

([3]) Dicha sentencia dispuso de 32 casos consolidados. Se radicaron contra ella los seis recursos de revisión que aparecen relacionados en el epígrafe. Los recursos Núms. 62-61, 62-156, 64-214 y 64-188 radicados por Island Constructors, Inc., y American Surety Co. envuelven idénticos señalamientos de errores. Los recursos Núms. 62-61 y 62-156 fueron consolidados a petición de los recurrentes. Los recursos Núms. 62-67 y 62-69 radicados por Carmen Martínez Cancel y otros y César Martínez Maldonado y otros, respectivamente, envuelven señalamientos similares entre sí.

## —I—

*Señalamientos Relativos a la Determinación*
*de Negligencia y Causa de los Daños* [4]

La conclusión fundamental del tribunal de instancia pertinente a esta cuestión fue en síntesis que los daños causados se debieron exclusivamente a la operación deficiente del sistema de pozos-taladros por Island Constructors, Inc., ya que conociendo ésta la naturaleza del subsuelo no tomó las medidas necesarias para evitar los daños; a saber, instalación de los pozos-taladros dentro de tablestacado debidamente sellado y el control del bombeo para evitar el desplazamiento de grandes cantidades de agua del subsuelo.

Las recurrentes, Island Constructors, Inc., y American Surety Co. impugnan dicha conclusión por el fundamento de que la misma no representa el balance más racional, justiciero y jurídico de la evidencia recibida. Arguyen que "el asentamiento fue la natural consecuencia de haberse bajado el nivel freático para poder instalar la tubería en seco, según lo requerían las especificaciones del contrato; que tal asentamiento hubiese ocurrido no empece el método utilizado para la extracción de agua, ni la forma adecuada en que este trabajo se realizara conforme a las especificaciones; y que el uso de tablestacado sellado para el fin prescrito en la especificación—evitar derrumbe de las paredes de las excavaciones—no hubiesen evitado el descenso del nivel freático ni el asentamiento de los terrenos adyacentes."

De lo anterior concluyen que los daños fueron el resultado directo y necesario de las obras realizadas para la construcción del alcantarillado pluvial y que, por lo tanto, el Gobierno de la Capital es la entidad responsable.

---

[4] Éstos son los apuntamientos a y b de los recursos Núm. 62-61 y 62-156, y los apuntamientos b y c de los recursos Núm. 64-214 y 64-188.

■ La prueba desfilada con respecto a la causa de los daños consistió principalmente de testimonio de peritos, [5] siendo la misma sumamente técnica y conflictiva. El tribunal de instancia resolvió el conflicto y dio entero crédito al perito de la codemandada Nolla, Galib & Co. La detenida y repetida lectura que hemos hecho del voluminoso récord—10 legajos de evidencia con más de 3,000 páginas—nos convence que el tribunal de instancia actuó dentro de su discreción al dirimir el conflicto en la forma en que lo hizo y que no se justifica que alteremos estas conclusiones en apelación porque las mismas tienen sobrado sostén en la prueba desfilada.

—II—

*Señalamientos Relativos a la Exoneración de Responsabilidad del Gobierno de la Capital* [6]

El tribunal de instancia concluyó sobre esta cuestión lo siguiente:

a) que la obra requerida para la construcción del alcantarillado no era inherentemente peligrosa por tratarse de trabajos de ingeniería que se realizan corrientemente;

b) que dichos trabajos no requerían precauciones extraordinarias para evitar daños, ya que mediante el empleo en forma adecuada de cualquier método aceptable para extraer el agua del terreno no podía anticiparse daños a las edificaciones vecinas; y,

c) que por su propia naturaleza los trabajos no tenían que causar o producir peligros de daños.

Con respecto a las anteriores conclusiones, y como cuestión de derecho, el tribunal de instancia concluyó que las relaciones entre Nolla, Galib & Co. e Island Constructors, Inc., eran la de contratista y subcontratista independientes y que, por tanto, Nolla, Galib & Co. no respondía de los daños cau-

---

[5] El tribunal tuvo ante sí el testimonio de cinco peritos.

[6] Cubre los señalamientos de los recursos Núms. 62-67 y 62-69.

sados por Island Constructors, Inc., máxime cuando no se trataba de una obra inherentemente peligrosa. Utilizó el tribunal este mismo razonamiento para exonerar de responsabilidad al Gobierno de la Capital.

Los recurrentes sostienen que debido a las condiciones y naturaleza del subsuelo, las obras eran inherentemente peligrosas, razón por la cual el Gobierno de la Capital estaba impedido de delegar su responsabilidad mediante una relación de principal y contratista independiente. Estamos de acuerdo con esta posición y procederemos de inmediato a exponer las razones que justifican la modificación de la sentencia dictada por el tribunal de instancia.

En términos generales, un propietario no responde por los actos negligentes de un contratista independiente. *Mariani* v. *Christy*, 73 D.P.R. 782 (1952). La jurisprudencia, sin embargo, ha establecido tantas y variadas excepciones a este principio general de inmunidad que algunos tratadistas como Prosser ya dudan de su validez. Prosser, *Law of Torts* 483–486 (Hornbook Series 1964).[7]

La doctrina del riesgo inherente invocada por los recurrentes para imponer responsabilidad al Gobierno de la Capital y a Nolla, Galib & Co. es una de las numerosas excepciones al principio general de inmunidad. En virtud de ella, el propietario responde por la negligencia de un contratista independiente en la construcción de una obra inherente o intrínsecamente peligrosa. Prosser, *supra*, 483; *Shelton Employers Liability for Negligence of His Independent Contractors*, 30 Tenn. L. Rev. 439; Anno: *Non-*

---

[7] En las notas de introducción a la Sec. 409 de *Restatement Of The Law, Torts, Second*, pág. 370 se advierte que las excepciones a este principio general son tan numerosas que "puede decirse que es 'general' sólo en el sentido de que se aplica cuando no se encuentra una buena razón para no aplicarlo." En *Pacific Fire Ins. Co.* v. *Kenney Boiler & Mfg. Co.*, 201 Minn. 500, 277 Nw. 226 (1937), citado en dicha nota introductoria, también se expresó:

"En efecto, es propio decir que la regla es ahora primordialmente importante sólo como un preámbulo al catálogo de sus excepciones."

*Delegable Duty of Employer With Respect to Work Which Is Inherently or Intrinsically Dangerous*, 23 A.L.R. 1084. Esta excepción está íntimamente ligada a otra que también impone responsabilidad al principal por la negligencia del contratista no sólo cuando la obra es inherente o intrínsicamente peligrosa, sino además, cuando se trate de una obra que en el curso natural de las cosas envuelva riesgos, a menos que se tomen precauciones especiales. Esta excepción se originó en Inglaterra en el caso de *Bower* v. *Peate*, L.R.I.Q.B. Div. Eng. (1876) expresándose en los siguientes términos:

"Una persona que ordena la ejecución de una obra de la cual, en el curso natural de las cosas, se puede anticipar consecuencias perjudiciales para los vecinos, a menos que se adopten medios para evitar tales consecuencias, tiene la obligación de velar porque se tomen las medidas necesarias para evitar daños, y no puede relevarse de responsabilidad empleando a otro—bien sea el contratista contratado para ejecutar la obra de la cual surge el riesgo o cualquier otra persona—para que tome dichas medidas."

En los Estados Unidos se ha aplicado esta excepción con un lenguaje similar, aunque no tan claro y preciso en *Chicago* v. *Robbins*, 2 Black (U.S.) 418.

Ambas excepciones la del riesgo inherente y la de *Bower* v. *Peate*, supra, están tan íntimamente ligadas que pueden considerarse no como doctrinas separadas e independientes, sino como parte de una misma regla de responsabilidad primaria, indelegable, del propietario por los actos negligentes de un contratista independiente. Véanse: Anno: *Non-Delegable Duty of Employers in Respect of Work Which Will in the Natural Course of Events Produce Injury, Unless Certain Precautions Are Taken*, 23 A.L.R. 1016; Anno: *Independent Contractor Rule as Aplicable to Injury or Death of Third Person as Result of Excavation and Refill Work*, 33 A.L.R.2d 7. Prosser las considera ambas como una sola

excepción a la regla general y así lo discute en su tratado sobre daños y perjuicios. Prosser, *supra*, 485. Lógicamente la una está necesariamente incluida en la otra ya que toda obra que sea inherente o intrínsecamente peligrosa, por su propia definición, cae en la concepción más abarcadora de *Bower* v. *Peate*, supra, que se refiere a obras que ordinariamente pueden causar daño a menos que se tomen precauciones especiales. En la práctica una y otra excepción han sido utilizadas indistintamente por los tribunales estaduales para llegar a un mismo resultado. *Restatement of the Law, Torts*, supra, 395. El *Restatement* adopta ambas doctrinas en las Secs. 416 y 427 advirtiendo que ambas se han aplicado indistintamente en diferentes casos y aun en un mismo caso.(8) Todo lo anterior nos convence de que debemos adoptar en nuestra jurisdicción la fórmula amplia y abarcadora de *Bower* v. *Peate* que impone responsabilidad al propietario por los actos negligentes del contratista en la ejecución de una obra que en el curso natural de las cosas pueda causar daño de no tomarse precauciones.

 Bajo la doctrina más abarcadora que aquí propugnamos no es requisito que el daño sea resultado *directo* y *necesario* del trabajo estipulado como establecimos en *Mariani* v. *Christy*, supra, y repetimos en *Bonet* v. *Muni-*

---

(8) Las Secs. 416 y 427 leen como sigue:

"§ 416. Work Dangerous in Absence of Special Precautions.

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

§ 427. Negligence as to Danger Inherent in the Work.

One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

564

*cipio de Barceloneta,* 87 D.P.R. 81 (1963). En dichos casos aplicamos el concepto restrictivo de la doctrina de riesgo inherente expresando que los daños tienen que constituir "un resultado directo y necesario del trabajo estipulado, o sea, si el trabajo a ser realizado no puede ser hecho sin peligros o daños a tercera persona y si ese trabajo, por su propia naturaleza y existencia, necesariamente tiene que causar o producir peligros o daños." Concebida en forma tan estrecha la norma de responsabilidad del principal su aplicación no tiene sustancial virtualidad y es del todo superflua. Es elemental en nuestro derecho que uno que ordena a otro, ya sea como contratista independiente o como simple empleado, a ejecutar un acto que necesariamente ha de causar daño, responde por su propio acto culposo de ordenar. Son casos claros de culpa que caen bajo las disposiciones del Art. 1802 del Código Civil, siendo innecesario esbozar teorías especiales de responsabilidad como hicimos en *Mariani* v. *Christy,* supra. (⁹) Por otro lado, son muy excepcionales, por cierto, las obras que por su propia naturaleza necesariamente causan daño. Aun aquellas que usualmente reconocemos como peligrosas, la electricidad y la dinamita, pueden ser utilizadas sin riesgo alguno por personas competentes y cualificadas para manipularlas. Todo lo cual indica la necesidad de considerar siempre las circunstancias que rodean la ejecución de la obra y no solamente la obra en sí.

Eliminado el concepto restrictivo de que el daño sea consecuencia necesaria de la ejecución de la obra, basta entonces para imponer responsabilidad al propietario que haya un riesgo reconocible, un daño previsible. No es necesario que el riesgo de causar daño sea grave o inevitable. Es suficiente que de las circunstancias específicas que rodean la ejecución de la obra pueda razonablemente reconocerse la

---

(⁹) En *Mariani* v. *Christy,* supra, se trataba de la ejecución de una obra por un contratista independiente que implicaba una transgresión a una propiedad ajena.

existencia de un riesgo que requiera tomar precauciones. Las precauciones tampoco tienen que ser de naturaleza extraordinaria. En *Bonet* v. *Municipio de Barceloneta,* supra, puntualizamos estos elementos esenciales de la responsabilidad del propietario. Sin embargo, decidimos el caso basándonos en el concepto restrictivo del daño que aquí abandonamos. En realidad no estamos diciendo nada nuevo. El elemento de previsibilidad de riesgo de que aquí hablamos es el mismo elemento de previsibilidad que es consustancial a toda la doctrina de responsabilidad civil estatuida en el Art. 1802 del Código Civil. [10]

Procede ahora aplicar los principios enumerados anteriormente al caso de autos. El tribunal de instancia elaboró su determinación, como ya sabemos, a base de:

a) Que la obra requerida para la construcción del alcantarillado no era inherentemente peligrosa por tratarse de trabajos de ingeniería que se realizan corrientemente;

b) Que dichos trabajos no requerían precauciones extraordinaria para evitar daño; y

c) Que por propia naturaleza los trabajos no tenían que causar o producir peligros de daños.

Se advierte inmediatamente que los criterios utilizados por el tribunal de instancia son los criterios restrictivos de la necesidad del daño que aquí rechazamos.

Está fuera de discusión que la construcción de un alcantarillado pluvial es una obra común y corriente de ingeniería que usualmente no debe anticipar daños. Lo mismo podemos decir de otras obras de ingeniería como la construcción de una calle o de un edificio para vivienda o de un parque. La anticipación del riesgo y de precauciones especiales no dependen, como ya dijimos, de la naturaleza de la obra, sino de las *circunstancias* que rodean su ejecución. En el caso

---

[10] Salvo, por supuesto, aquellos casos excepcionales en que se pueda aplicar la responsabilidad objetiva.

de autos las circunstancias establecidas por la prueba y sobre las cuales no hay discusión fueron las siguientes:

a) El contrato de instalación de la tubería para el alcantarillado pluvial requería que los tubos se instalaran en seco a una profundidad de alrededor de ocho pies.

b) Los planos indicaban con meridiana claridad—"como si tuvieran un retrato del subsuelo"[11]—que el nivel freático en el sector donde se iban a instalar los tubos se encontraban a una distancia de cerca de dos pies de la superficie de la calle.

c) También indicaban los planos que el subsuelo estaba compuesto de una capa de materia turbosa (*peat*) que fluctuaba entre seis y ocho pies y otra capa inferior compuesta de arena fina hasta una profundidad de veinte y uno a veinte y tres pies.

Además, se desprende de la prueba desfilada lo siguiente:

a) El Gobierno de la Capital tenía conocimiento de la naturaleza del subsuelo no sólo por el plano sino porque anteriormente habían ocurrido hundimientos en algunas calles de Ocean Park que requirieron reforzar las aceras.[12]

b) El ingeniero Efraín Muratti al describir el subsuelo expresó que "para mí es una sorpresa que en ese [*sic*] área haya seis o siete pies de 'peat' y que eso se haya sostenido sin haber una catástrofe".[13]

c) El sistema de pozos-taladros para la extracción de agua requiere precauciones especiales que no se tomaron en este caso, según vimos al discutir la primera parte de esta opinión.

■ Visto lo anterior, es forzoso concluir que la construcción del alcantarillado pluvial en el sector de Ocean Park constituía una obra en el curso de la cual cualquier persona hubiese reconocido razonablemente los riesgos de causar daños si no se tomaban precauciones. Los elementos fundamentales de responsabilidad—riesgo peculiar y precauciones especiales —surgían claramente de todas las circunstancias anteriores. Siendo ello así, el Gobierno de la Capital no quedaba inmune de responsabilidad al contratar la ejecución de la obra con

---

(11) Testimonio del ingeniero Capacete. T.E. Vol. 5, pág. 19.

(12) Testimonio del ingeniero Tejada. T.E. Vol. 2, págs. 204 y 205.

(13) Testimonio del ingeniero Efraín Muratti. T.E. Vol. 3, pág. 307.

un contratista independiente. Su responsabilidad es de carácter primario, indelegable frente a los demandantes. Responde no por su negligencia sino por la naturaleza de la obra. Por otro lado, como los daños fueron ocasionados por la negligencia del contratista independiente, Island Constructors, Inc., al operar ésta deficientemente el sistema de pozos-taladros, ésta responde por su propia negligencia a los demandantes. También responde al Gobierno de la Capital por todo lo que éste venga obligado a pagar, en virtud del subcontrato con Nolla, Galib & Co. mediante el cual asumió todas las obligaciones de éste hacia aquél. (14)

A tenor con lo anterior, concluimos que el tribunal de instancia incidió al desestimar la demanda contra el Gobierno de la Capital.

—III—

*Señalamientos Relativos al Alcance de la Responsabilidad de la American Surety Co., bajo las pólizas de Responsabilidad Pública y bajo las Fianzas para el Cumplimiento del Contrato* (15)

1. La póliza de responsabilidad pública otorgada por la American Surety Co. cubre sólo daños causados por accidente. Basándose en esta limitación, la recurrente American Surety

---

(14) La Sec. 4 del subcontrato entre Nolla, Galib & Co. y Island Constructors, Inc., lee como sigue:

"Section 4. The Subcontractor declares that he has thoroughly examined the drawings and specifications governing the work embraced in the above mentioned contract between the Owner and the Contractor, of which the work covered by this agreement is a part, *and he hereby agrees to assume toward the Contractor all the obligations and responsibilities which the Contractor has assumed toward the Owner under said Contract between the Owner and the Contractor so far as they apply to the part of the work covered by this agreement.*" (Énfasis suplido.)

(15) Esta parte cubre los apuntamientos IV, V, VI, VII, y VIII de los recursos Núms. 64-214 y 64-188 y los apuntamientos, (g), (h), (i), (j), (k), (*l*) y (m) de los recursos Núms. 62-61 y del 62-156 consolidados con éste.

Co. elabora el argumento de que los daños no fueron resultado de un accidente, toda vez que "era no sólo previsible, sino que fue advertidamente anticipado que no se ocasionarían daños sustanciales a las demás propiedades de los demandantes, tal y como en efecto sucedió según se continuó posteriormente la obra." No tiene razón.

▪ En su acepción común y corriente, que es la única que debemos tomar en consideración, el término "accidente" significa un suceso imprevisto, súbito o inesperado desde el punto de vista del que sufre el daño y no del causante. *Knight* v. *L. H. Bossier*, 118 So.2d 700; *United States Fidelity And Guarantee Co.* v. *Brisco*, 239 P.2d 754; *Moore* v. *Fidelity Casualty*, 205 P.2d 154. Véase además, a Appleman 7A *Insurance Law And Practice*, § 4492. Por eso, no tiene relevancia alguna el hecho de que la recurrente Island Constructors, Inc., previera o pudiera prever que la ejecución de la obra podía causar daño. Para los perjudicados, el hundimiento de sus casas fue un verdadero accidente, un suceso imprevisto, súbito e inesperado.

2. En lo que concierne al alcance de la responsabilidad de American Surety Co. bajo la fianza, el tribunal de instancia resolvió: a) que "la obligación de restituir las propiedades vecinas al estado que tenían antes de la ejecución de las obras, . . . es de origen contractual y fue asumida por Island Constructors, Inc. en virtud de los términos del subcontrato. Del cumplimiento de esta obligación contractual responde su fiadora bajo los términos del 'performance bond', independientemente de que se establezca o no negligencia en la ejecución de las obras, . . .";([16]) b) que aun cuando la fianza no estaba constituida para beneficio de los demandantes, éstos podían demandar como terceros beneficiarios; c) que la responsabilidad de American Surety Co. no estaba limitada al monto de su fianza; y, d) que American Surety

---

([16]) Conclusión de Derecho Núm. 12 del tribunal de instancia.

Co. asumió obligaciones más amplias y abarcadoras que la dispuesta en la fianza al optar por terminar la ejecución del subcontrato a cuyos efectos sustituyó a su fiada, Island Constructors, Inc.

No es necesario que consideremos si los demandantes-recurridos tienen personalidad para exigir el cumplimiento de las obligaciones contractuales de Island Constructors, Inc., relativas a la restitución de las propiedades damnificadas a su estado original. Tampoco tenemos que considerar si los demandantes-recurridos tienen o no derecho a reclamar bajo la fianza otorgada por American Surety Co. para la ejecución de la obra, ya que en vista de la conclusión a que hemos llegado anteriormente fijando responsabilidad primaria al Gobierno de la Capital, éste responderá directamente a los demandantes y, como vimos anteriormente, Island Constructors, Inc., responderá directamente al Gobierno de la Capital de todos los daños y perjuicios que éste pague a los demandantes. En su defecto, responderá su fiadora, American Surety Co.

Por otro lado, el contrato de construcción del Gobierno de la Capital con Nolla, Galib & Co. contiene una cláusula de exoneración que impone la obligación al contratista de resarcir al Gobierno de la Capital los daños que éste tuviera que satisfacer por causa de la ejecución de la obra. ([17]) En

---

([17]) Dicha cláusula lee:

"General Conditions—7.11 RESPONSIBILITY FOR DAMAGE CLAIMS—

*The contractor shall save harmless the Capital of Puerto Rico and all its officials, representative and agents from all suits, actions, or claims of any character brought on account of any injuries or damages received or sustained by any person, persons, or property through the acts of the contractor, his agents or servants, or by or in consequence of any neglect on the part of the contractor,* or his agents or servants, in safeguarding the work, or through the use of inacceptable materials in the construction of the work, or by or on account of any claims or amounts recovered for any infringement of patent, trademark or copyright, and for any claims or amount arising from or recoverable under the Workmen's Compensation laws or any other laws, ordinances, by-laws, orders or decrees. The *contractor shall be responsible for all damage or injury to property of any*

virtud de dicha cláusula, Nolla, Galib & Co. respondería también al Gobierno de la Capital en cuyo caso Island Constructors, Inc., vendría a su vez obligada a resarcir a Nolla, Galib & Co. cualquier cantidad que ésta pagara al Gobierno de la Capital, puesto que así se obligó en la Sec. 4 del subcontrato con aquél.([18]) No es necesario, sin embargo, considerar la responsabilidad de Nolla, Galib & Co. hacia el Gobierno de la Capital porque éste no interpuso recurso alguno contra la disposición de la sentencia exonerando a aquél.

3. Ordinariamente la responsabilidad de una aseguradora se limita al pago de la penalidad que aparece de la faz de la fianza. Así lo reconoció el tribunal de instancia pero concluyó que al optar American Surety Co. por la terminación del subcontrato asumió una obligación más amplia y abarcadora. La contención de la fiadora American Surety Co. es que cualquier obligación que en virtud de la fianza ella asumiera está limitada al monto fijado en la propia fianza. No estamos de acuerdo.

■ Cuando un fiador se hace cargo de la ejecución de un contrato de construcción, como en este caso, asume las obligaciones y responsabilidades del contratista original. Couch, *On Insurance, Second,* § 47.136; *Southern Surety Co.* v. *Sealy Independent School District,* 10 S.W.2d 786 (1928 Texas); *McClintic-Marshall Corp.* v. *Maryland Cas. Co.,* 100 S.W.2d 438 (1937 Texas); *Galesburg Sanitary Dist.* v. *American Surety Co.,* 32 N.E.2d 407 (1941 Ill.); *Mazzera* v. *Ramsey,* 238 Pac. 101 (1925 Cal.). Está en la misma posición del contratista original con respecto al cumplimiento

---

*character during the prosecution of the work resulting from any act, omission, neglect or misconduct in the manner or method of executing said work or due to the nonexecution of said work at any time,* or due to defective work or materials, and such responsibility shall continue until the work has been completed and accepted by the Director." (Énfasis suplido.)

([18]) Véase el Escolio 14 donde reproducimos dicha Sec. 4.

de las obligaciones que emanan del contrato sin limitación en cuanto al monto de la fianza. *Caron* v. *Andrew*, 284 P.2d 544 (1955 Cal.); *Klein* v. *J. D. & J. M. Collins*, 106 So. 120 (1925 La.) en el cual se expresó a la pág. 122:

"Considerado, primero, la contención de la compañía aseguradora puede afirmarse que, si por ejemplo ésta hubiera dejado al propietario la terminación de la obra al abandonarla los contratistas, incuestionablemente no podía hacerse responsable a la compañía por una cantidad mayor que la que se obligó como aseguradora, salvo por aquellas cantidades adicionales impuestas por ley, como las costas judiciales y penalidades estatutorias. * * * Sin embargo, si la compañía, al abandonar la obra los contratistas, tomó a su cargo la terminación, la situación es diferente. En tal caso, la compañía se pone a sí misma en el lugar de los contratistas desde el momento que tomó a su cargo la obra y adviene responsable por los costos de la terminación, sin referencia alguna a la cantidad a que se obligó como fiadora. En otras palabras, en tal caso, desde ese momento en adelante, la compañía ocupó la posición del contratista y adviene responsable en consecuencia por los costos de la terminación de la obra, y también por los daños según fijados en el contrato, por la dilación y entrega del edificio."

En resumen, no incidió el tribunal de instancia al concluir que la fiadora asumió una obligación más amplia y abarcadora.

*Aplicación de la Doctrina de Negligencia Comparada* [19]

■ El tribunal de instancia concluyó que el "asentamiento de los terrenos no hubiera ocasionado daños a las estructuras vecinas si éstas hubiesen estado construidas de acuerdo con los métodos aceptados en ingeniería para subsuelos del tipo existente en Ocean Park." Sostienen los recurrentes que en vista de esta conclusión el tribunal de instancia debió aplicar la doctrina de negligencia concurrente y rebajar proporcionalmente la indemnización. Aunque admi-

---

[19] Esta parte se refiere al señalamiento Núm. 9 de los recursos 62-61, 62-156 y 64-214.

tiéramos como válida esta contención, [20] la misma adolece de un vicio fatal: Los recurrentes no presentaron prueba alguna para demostrar qué parte de los daños fueron ocasionados por las condiciones de las estructuras y qué parte fue causado por su propia negligencia. No habiendo dicha prueba en el récord, la recurrente debe asumir la responsabilidad por todos los daños sufridos. *Concepción Guzmán* v. *A.F.F.*, 92 D.P.R. 488 (1965).

### Impugnación de Nuestra Jurisdicción

El recurrido Gobierno de la Capital impugna nuestra jurisdicción por el fundamento de que la solicitud de revisión se radicó fuera de término. Arguye que la sentencia parcial dictada por el tribunal de instancia el 29 de julio de 1960 era una sentencia final ya que "resuelve los méritos de la controversia, o los derechos de las partes, sin dejar nada para una futura determinación"; que dicha sentencia declaró sin lugar la demanda en cuanto al Municipio y así mismo declaró sin lugar las reclamaciones contra coparte formuladas por Island Constructors, Inc. No tiene razón.

La Regla 44.2 de Procedimiento Civil dispone que cuando un pleito comprenda más de una reclamación, "el Tribunal podrá dictar sentencia final en cuanto a una o más de las reclamaciones pero no en cuanto a la totalidad de ellas, *siempre que concluya expresamente que no existe razón para posponer el dictar sentencia sobre tales reclamaciones hasta la resolución total del pleito y siempre que ordene expresamente que se registre sentencia.* En ausencia de la referida conclusión y orden expresa, cualquier . . . decisión, . . . que adjudique menos del total de las reclamaciones, *no terminará el pleito* con respecto a ninguna de las reclamaciones y la . . .

---

[20] En contra de esta posición de los recurrentes está el principio de derecho de que el que actúa negligentemente asume la responsabilidad de reparar los daños dentro del estado de cosas según éstas se encontraban antes del acto torticero. Véase: Prosser, *Law Of Torts, Second*, pág. 260.

decisión estará sujeta a reconsideración por el Tribunal que la dicte en cualquier momento antes de registrarse sentencia adjudicando todas las reclamaciones." (Énfasis nuestro.)

■ La sentencia parcial dictada el 29 de julio de 1960 no concluyó expresamente, a tenor con lo dispuesto en la Regla 44.2, que no existía razón para posponer el dictar sentencia sobre las reclamaciones contra el Municipio. Los requisitos de la Regla 44.2 son de estricto cumplimiento ya que van dirigidos a evitar confusión sobre cuándo comienza a contar el término apelativo o de revisión. Siendo ello así la sentencia no fue final hasta que se adjudicaron los daños el 12 de febrero de 1962.

*Error Núm. 10*

El tribunal de instancia concedió a Joaquín Valdivieso una indemnización de $13,300.00 por los daños a su propiedad más $3,900.00 por concepto de cánones de arrendamiento que se vió obligado a pagar en los Apartamientos Gallardo desde el día 8 de agosto de 1959 hasta el 12 de febrero de 1962, fecha en que se dictó la sentencia recurrida, por haberse tenido que mudar de su casa debido a los daños sufridos por ésta. Se quejan las recurrentes que el tribunal concedió esta indemnización sin tener prueba alguna sobre el tiempo razonablemente necesario para reparar la residencia de dicho demandante.

De la prueba desfilada surge que: a) el señor Valdivieso se vió obligado a mudarse de su casa debido a las condiciones de ésta; b) que pagaba para amortización de un préstamo a la F.H.A. la cantidad de $83.00 mensuales y la cantidad de $130.00 mensuales en los Apartamientos Gallardo; c) que era un empleado de la Industria de Prisiones del Departamento de Justicia; y, d) que los daños a su residencia fueron manifestándose paulatinamente, por lo que deducimos que no era recomendable comenzar a reparar la

casa hasta estar más seguro de que no iban a ocurrir nuevos asentamientos. Tomando en conjunto estas circunstancias, consideramos que no incidió el tribunal de instancia al conceder la cantidad de $3,900.00 por concepto de cánones de arrendamiento.

 En el recurso de revisión Núm. 62-68, el señor Joaquín Valdivieso Llompart a su vez recurrió de la sentencia dictada por el tribunal de instancia imputándole como error que no se le concedió indemnización por los sufrimientos y angustias mentales "padecidos por causa de los contínuos ruidos producidos por el equipo de uno o todos los demandados; por los malos olores causados por el estancamiento de agua; todo lo cual es y ha sido perjudicial a la salud y ofensivo a los sentidos de los demandantes . . . ."[21] Cita en su apoyo a *Pereira* v. *I.B.E.C.*, 95 D.P.R. 28 (1967). La doctrina sentada en el citado caso no es de aplicación porque allí se trataba de angustias mentales por incumplimiento de contrato, mientras que aquí la reclamación del recurrente se basó en la perturbación de su propiedad.[22] Pero independientemente de la inaplicabilidad de *Pereira* v. *I.B.E.C.*,

[21] La alegación según aparece de la demanda es la siguiente:

"9.—En vista de todas las molestias antes mencionadas, del estado ruinoso que se encuentra su residencia, depreciación, gastos de reparación, los sufrimientos físicos y angustias mentales padecidos por causa de los contínuos ruidos producidos por el equipo de uno o todos los demandados, por los malos olores causados por el estancamiento de agua, todo lo cual es y ha sido perjudicial a la salud y ofensivo a los sentidos de los demandantes; por la interrupción del libre y cómodo uso de su propiedad, menoscabando su bienestar personal; el miedo a que la casa se le derrumbe encima, gastos incurridos y a incurrirse, los demandantes han sufrido daños y perjuicios que estiman en la suma de NOVENTA MIL DÓLARES ($90,000.00)."

[22] La teoría aducida por el recurrente ante el tribunal de instancia fue expuesta en la forma siguiente:

"Lic. Martínez, Jr.:

. . . . . . . . .

Aquí no se está reclamando ni daños por sufrimientos morales ni por daños ocasionados a una propiedad. Aquí se reclaman a base del Artículo 277 del Código de Enjuiciamiento Civil." T.E. Vol. 2, pág. 173.

supra, el señalamiento no tiene mérito porque el caso de autos envuelve la construcción de una obra pública para beneficio de toda la comunidad y como muy bien señaló el tribunal de instancia "esas son molestias que tiene que sufrir todo ciudadano . . . ." (23)

## Error Núm. 11

El tribunal concedió al demandante Jerónimo Ruiz la suma de $5,034.10 por concepto de beneficios dejados de percibir en su negocio de cafetería y fuente de soda desde la fecha estipulada en el contrato para la terminación de la obra, 19 de septiembre de 1957, hasta la fecha en que se reanudó el tránsito por el sector en que ubicaba su negocio, 21 de mayo de 1959. La recurrente impugna esta indemnización por el fundamento de que las inconveniencias, molestias y entorpecimiento que necesariamente se ocasionan mientras se efectúa una mejora pública no son compensables.

■ Ese es, sin duda alguna, el principio general. Pero como toda regla general, tiene sus limitaciones impuestas por la razón y la justicia. No se debe obstruir la calle innecesariamente. Aun cuando sea necesario, la obstrucción nunca debe ser por más tiempo del razonable. *Lefkovitz* v. *City of Chicago*, 87 N.E. 58 (1908 Ill.) ; *Cassel* v. *City of New York*, 153 N.Y. Supp. 410 (1915). Véase además casos citados en: Anno: *Liability of Public Contractor to Property Owner for Obstructing Street*, 68 A.L.R. 1510.

En el caso de autos el término pactado para la terminación de la obra fue de alrededor de cinco meses. Sin embargo, el tránsito estuvo interrumpido por cerca de veinte meses. A la luz de los hechos que hemos expuestos anteriormente, concluimos que fue irrazonable esta interrupción. No se cometió el error señalado.

---

(23) T.E. Vol. 3, pág. 176.

## Error Núm. 12

El recurrido León Lyons([24]) radicó su demanda contra Island Constructors, Inc., el 8 de agosto de 1958. Nunca la emplazó, pero en febrero de 1959 enmendó la demanda para adicionar como demandada a la American Surety Co. como aseguradora de aquélla y bajo los términos de la póliza de seguro.

La recurrente imputa como error al tribunal de instancia el no declarar prescrita la demanda en este caso. Aduce que a tenor con *Sucn. Gorbea* v. *Portilla*, 46 D.P.R. 288 (1934), y *De Jesús* v. *De Jesús*, 37 D.P.R. 152 (1927), la interrupción del término prescriptivo mediante la radicación de la demanda produce el efecto de que el término empieza a contarse de nuevo desde la fecha de la interrupción. De ahí concluye que la causa de acción contra Island Constructors, Inc., está prescrita. También arguye que cuando se incluyó como demandada a American Surety Co. en febrero de 1959 había transcurrido más de un año desde la ocurrencia de los daños. No tiene razón.

■ Con respecto a la interrupción del término prescriptivo por la radicación de la demanda contra Island Constructors, Inc., el planteamiento de la recurrente fue ya resuelto en contra de sus pretensiones en *Feliciano* v. *A.A.A.*, 93 D.P.R. 655 (1966).

■ Con respecto a la defensa de prescripción de la American Surety Co., basta referirse al Art. 20.030(2) ([25]) del Código de Seguros, 26 L.P.R.A. sec. 2003, que reconoce el derecho del perjudicado de iniciar una causa de acción

([24]) Recurso de Revisión Núm. 64-188.

([25]) El Art. 20.030(2) lee como sigue:

"Si el perjudicado entablara demanda contra el asegurado solamente, no se estimará por ello que se le prive, subrogándose en los derechos del asegurado con arreglo a la póliza, del derecho de sostener acción contra el asegurador y cobrarle luego de obtener sentencia firme contra el asegurado."

contra la aseguradora aun después de haber obtenido sentencia firme contra el asegurado. Esto significa que en el caso de autos la causa de acción contra la American Surety Co. todavía está en tiempo, aunque han pasado más de diez años desde que se enmendó la demanda para incluirla como parte demandada. Véase: *Trigo* v. *The Travelers Ins. Co.*, 91 D.P.R. 868 (1965), el cual contiene una magnífica discusión sobre el origen y alcance del mencionado Art. 20.030.

### *Error Núm. 13*

Este apuntamiento se refiere al recurso de revisión Núm. 62-214. Se imputa al tribunal de instancia que incidió al no declarar prescrita la demanda de Heriberto Berly, la que fue radicada el 2 de noviembre de 1958.

De la vista celebrada el 27 de octubre de 1961 para ventilar la moción de desestimación por razón de prescripción, se desprende que los daños se "produjeron u observaron . . . desde los meses de abril o marzo de 1957 hasta hace alrededor de un mes.",[26] que el demandante Berly cursó una carta a Nolla, Galib & Co. el 28 de febrero de 1958 reclamándoles daños; que dicha carta se envió a Island Constructors, Inc. Siendo ello así, la reclamación del señor Berly no está prescrita.

*Se dictará sentencia de conformidad con los términos y conclusiones de esta opinión.*

Los Jueces Asociados Señores Pérez Pimentel y Blanco Lugo no intervinieron.

Los Jueces Asociados Señores Hernández Matos y Santana Becerra son del criterio de que también debe imponerse a Nolla, Galib & Co. responsabilidad directa hacia los recurrentes.

---

[26] Contestación del 6 de marzo de 1959 dada por el demandante Berly a los interrogatorios sometídosle por American Surety Co. Dicha contestación fue admitida en evidencia.