*906 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos, la Unión de Camioneros del Este (apelante), y solicita que revisemos una Sentencia Parcial de 25 de septiembre de 2007 que dictó el Hon. Juan R. Hernández Sánchez, Juez del Tribunal de Primera Instancia, Sala de Río Grande (TPI), y además, una Sentencia de 28 de abril de 2008, notificada a las partes el 10 de junio de 2008 que dictó el mismo magistrado. En los aludidos dictámenes se dispuso de una demanda en daños y perjuicios que presentó José Rodríguez Nieves (apelado) contra varios codemandados, entre los cuales, figuraron Juan J. Morales Martínez, Marcos Santiago López y la apelante.
En el primer dictamen apelado, se recogieron las incidencias de la vista en la que se determinó que Marcos Santiago López actuó negligentemente. Además, se indicó que Juan J. Morales Martínez y la apelante debían responder solidariamente al apelado por los daños que se probaran que fueron causados por las actuaciones negligentes de Marcos Santiago López. En el segundo dictamen, se repasó y aquilató la prueba que presentó el apelado en relación a los daños que alegó que sufrió. También, se detalló la valoración y cuantificación de los daños que se estimaron probados. Más, se proveyó para el pago de una indemnización.
Inconforme con el resultado del pleito, la apelante acudió ante nos en una primera ocasión para solicitar la revisión de la Sentencia Parcial apelada. En el ánimo de evitar una dilación innecesaria en el trámite del caso, nos negamos a intervenir. Así lo expresamos en una Resolución de 13 de noviembre de 2007.
Ahora, concluido el pleito mediante Sentencia final, la apelante acudió nuevamente ante nos. Señala que el TPI erró, primero, al haber determinado que la apelante debió prever los actos negligentes del codemandado Marcos Santiago López; segundo, al haber determinado que la apelante debía responder solidariamente por los daños del apelado, y en la alternativa, cuestionó que no se detallara la distribución del por ciento de culpa de uno y otro de los codemandados; tercero, al haber concedido un remedio al apelado por concepto de lucro cesante; y por último, por haber concedido una partida de honorarios de abogado.
Luego de examinar los argumentos de la apelante y con el beneficio de la comparecencia del apelado, resolvemos. Adelantamos que modificamos la sentencia respecto a la cuantía concedida por lucro cesante. Así modificados, confirmamos los dictámenes apelados.
I
Esbozamos a continuación una breve relación de los hechos e incidencias más relevantes para la resolución del caso.
En síntesis, el apelado alegó haber sufrido daños por la actuación negligente de Marcos Santiago López. Este último operaba un camión propiedad del otro codemandado, Juan J. Morales Martínez, y ello, mientras realizaba labores de acarreo en un proyecto de construcción para el cual fue contratado (o sub-contratado) por la apelante, la Unión de Camioneros del Este. El apelado, por su parte, trabajaba en el mismo proyecto de construcción como perito electricista.
El día de los hechos, según se alegó y reconoció Marcos Santiago López, éste condujo el camión con la plataforma de carga (o tumba) levantada. De este modo, terminó por impactar el tendido de cables de la Puerto Rico Telephone Company. Seguido, arrastró los postes en los que estaban adosados los cables. Los cables se desprendieron e impactaron al apelado, quien cayó al suelo. El cable, según testificó el apelado, se enrolló en su cuerpo y lo arrastró mientras el camión seguía su marcha, a su vez, arrastrando los postes. Finalmente, al apelado se le trasladó a un hospital para recibir atención médica.
*907 De acuerdo a la prueba testifical desfilada en la vista de daños, al apelado se le colocaron varios yesos que causaron su inmovilización. Lo anterior, debido a las fracturas que sufrió en el tobillo y pierna derecha! Recibió más de 30 terapias. Además, requirió utilizar sillón de ruedas, y luego, bastón y muletas para poder caminar. El apelado no pudo trabajar más desde que ocurrió el accidente, ya que no podía moverse con normalidad.
De acuerdo a la prueba pericial, el apelado quedó afectado con una incapacidad permanente equivalente a un 6%, y esto, por la pérdida de movimiento de su tobillo derecho. Su condición le impide subir escaleras o cuestas, sufre de poco balance y tiende a tropezar. La pérdida de movimiento es tal que no puede subir y bajar el tobillo, por lo cual se mueve arrastrando el pie. Además, presentó una atrofia en el muslo y la pantorrilla. Cada una de estas dos condiciones representa un 1% adicional de incapacidad. Durante el juicio, la apelante no presentó prueba que refutara el testimonio pericial ofrecido por el apelado.
Por otro lado, la prueba presentada por el apelado acreditó que cuando trabajaba, previo al accidente, generaba ente $12,000 a $15,000 al año. [1] Añadió que se retiró, por edad (tras cumplir 62 años), no por incapacidad, y que comenzó a recibir el seguro social. [2] Según la prueba presentada, trabajó y rindió planillas de contribución sobre ingresos hasta el 2001. En el 2002 fue que comenzó a recibir el seguro social. [3] El apelado decidió dejar de trabajar en el 2002 y dedicarse a ayudar a su esposa que estaba afectada por determinada condición que sufrió. Pero aclaró que su decisión era provisional, ya que proyectaba reincorporarse al mundo laboral transcurrido ese año. Ya en el 2003, año en que ocurrieron los hechos objeto del pleito, había comenzado a trabajar. [4]
Durante el contrainterrogatorio, el apelado indicó que después de comenzar a recibir el seguro social, continuaba trabajando. Declaró que hacía sus “cositas”, siempre pendiente de no excederse de los beneficios que recibía del seguro social. Esto es, aclaró que para no rendir planilla, se cuidaba de generar solamente entre $1,000 a $2,000 (al año). [5]
Entre otros asuntos, se hizo constar que el conductor del camión, Marcos Santiago López, estipuló su negligencia. Más aún, detalló su relación con la apelante. Explicó que pagaba una cuota a la apelante, y que ésta le buscaba y ubicaba en distintos proyectos de construcción para que trabajara. En resumen, el TPI analizó y determinó que la relación entre aquél con la apelante se trataba de una entre un contratista independiente con un principal.
Destacó el TPI que la apelante no podía relevarse, sin más, de los actos negligentes de Marcos Santiago López. Adujo que, según la jurisprudencia, el principal podía ser responsable por los actos del contratista independiente si el trabajo para el que se contrataba involucra riesgos especiales o particulares, fuera por la naturaleza del trabajo o del sitio donde se realizara. También, estimó el TPI que la responsabilidad del principal estaba condicionada a que se probara que era previsible los riesgos inherentes del trabajo que debía realizar el contratista independiente.
Tomando en cuenta esos principios, el TPI concluyó que el acarreo de carga, representaba una actividad riesgosa. Indicó que en este caso, no se trataba del manejo de vehículos comunes en áreas habilitadas para ello. Hizo hincapié en que el caso involucraba el manejo de camiones cuyas dimensiones superaban las de los vehículos comunes y que la labor de acarreo se llevaba a cabo en áreas de actividad constante de otras personas. Señaló que el nivel de riesgo que conllevaba la labor de acarreo para las personas que trabajaban en el proyecto debía ser previsible a la apelante. Aclaró que no se trataba de que la apelante experimentara una previsibilidad profética, de modo que pudiera anticipar que el hecho iba a ocurrir tal y como sucedió, pero sí debía prever un peligro especial inherente a las labores de acarreo. Finalmente, determinó que por los actos negligentes de Marcos Santiago López, el dueño del camión y la apelante también debían responder de manera solidaria.
Además de lo anterior, tras la celebración de la vista de daños, el TPI reiteró que los codemandados *908 (incluyendo a la apelante), debían compensar solidariamente al apelado. Ahora bien, no hizo una distribución de por cientos de responsabilidad entre los codemandados. Valga indicar que entre las partidas desglosadas como indemnización, se incluyó una de lucro cesante. El TPI determinó como un hecho que cuando trabajaba, el apelado generaba un promedio de $10,000 al año. También, indicó que el interés del apelado por volver a trabajar había quedado frustrado por el accidente que sufrió. Finalmente, dispuso que se le debía indemnizar con $60,000 por concepto de lucro cesante. Por otro lado, entre las partidas desglosadas, también se incluyó una de honorarios de abogado que ascendió a $5,000.
Tomando en cuenta lo anterior, llegamos a las siguientes conclusiones, basándonos en el derecho aplicable.
A
La apelante reconoció en su argumentación de los primeros dos errores señalados que el caso trata de la negligencia de un contratista independiente. [6] Como expresó y reconoció la apelante, así lo determinó el TPI. Entonces, lejos de cuestionar esta determinación, más bien comenzó a presentar teorías relacionadas a supuestos excepcionales que, a su juicio, le eximían de responder por la negligencia del contratista independiente, Marcos Santiago López. Por lo anterior, entendemos que la apelante reconoce, de entrada, su vínculo como “principal” respecto al contratista independiente, Marcos Santiago López. En cuanto a sus argumentos, los rechazamos. Acogemos más bien la interpretación y aplicación del derecho que hizo el TPI. No se cometió el primer error señalado.
En Barrientos v. Gob. de la Capital, 97 D.P.R. 552 (1969), se discutió la responsabilidad que tenían el dueño de una obra y un contratista por el subcontratista que directamente cometió los actos culposos o negligentes. [7] Se destacó que, en términos generales, un dueño de obra no responde por los actos negligentes de un contratista independiente. Ahora bien, según se explicó, esta norma admite excepciones. Así, por ejemplo, una norma establece que el dueño de la obra o principal responde por la negligencia de un contratista independiente en la construcción de una obra inherente o intrínsecamente peligrosa. Id., pág. 561. Más aún, esta excepción está ligada a otra, por la cual se impone responsabilidad al principal por la negligencia del contratista, y ello, cuando se trate de una obra que en el curso natural de las cosas envuelva riesgos, a menos que se tomen precauciones especiales. Esta última norma fue adoptada en nuestro ordenamiento por el citado caso. Id., páginas 562-563.
Se aclaró que no es necesario probar que el daño producido por el contratista independiente sea consecuencia necesaria de la ejecución de la obra; basta para imponer responsabilidad al dueño de la obra o principal que haya un riesgo reconocible, un daño previsible. Id., pág. 564. No es necesario que el riesgo de causar daño sea grave o inevitable. Es suficiente que de las circunstancias específicas que rodean la ejecución de la obra pueda razonablemente reconocerse la existencia de un riesgo que requiera tomar precauciones. Las precauciones tampoco tienen que ser de naturaleza extraordinaria. Id., páginas 564-565. Se recalcó que la anticipación del riesgo y de precauciones especiales depende del análisis de las circunstancias que rodean la ejecución de la obra. Id.
Se concluyó en el referido caso que las circunstancias de la obra involucrada en el caso, la construcción de un alcantarillado, constituía una obra en el curso de la cual cualquier persona hubiese reconocido razonablemente los riesgos de causar daños si no se tomaban precauciones. Se detallaron las circunstancias en las que se ejecutó la obra, y se determinó que estaban presentes los elementos fundamentales de responsabilidad, esto es, riesgo peculiar y precauciones especiales.
A un resultado similar arribó el TPI en el caso que nos ocupa. Tal y como se indicó, las circunstancias que permean la labor de acarreo de materiales dentro de un proyecto de construcción, con el tipo de equipo pesado *909 que se usa para tal fin, tomando en cuenta el alto flujo de personas que concurre en el área de construcción, son factores que nos convencen de que cualquier persona hubiese reconocido y previsto, razonablemente, los riesgos latentes de causar daños que podía producir esta actividad si no se tomaban precauciones. En tal sentido se dirigió el análisis del TPI y lo avalamos. Esto, tras la determinación de que la apelante y Marcos Santiago López estaban vinculados dentro de una relación de principal y contratista independiente.
Esta normativa se afianzó en Martínez v. Chase Manhattan Bank, 108 D.P.R. 515, 521-523 (1979). En ese caso se indicó que la persona que emplea un contratista independiente, para hacer trabajo que el empleador debe reconocer como propenso a crear durante su desarrollo un riesgo peculiar de daño a tercero a menos que se tomen precauciones especiales, está sujeta a responsabilidad por el daño causado por razón de no haberse cuidado el contratista de tomar tales precauciones, aun cuando el empleador las hubiese ordenado en el contrato o por cualquier otro medio. Por otro lado, se aclaró que quien emplea al contratista no responde por la negligencia corriente de éste que resulte en daño para tercera persona, ni por su inobservancia de precauciones de rutina que un contratista cuidadoso debe usualmente tomar. La responsabilidad del empleador, según se indicó, gira en torno a riesgos especiales o peculiares al trabajo que deba realizarse y que surgen de su naturaleza o del sitio donde deba realizarse, contra los cuales un hombre razonable reconocería la necesidad de tomar precauciones especiales. Se destacó que peculiar no quiere decir que sea un riesgo anormal en ese tipo de labor o que ha de ser un riesgo anormalmente grande. Se refiere sólo a un peligro especial y conocible que se da en esa clase de trabajo.
La apelante argüyó que este caso guarda extrema similitud con los hechos discutidos en López v. Gobierno Mun. de Cataño, 131 D.P.R. 694 (1992). No estamos de acuerdo. Tal y como se explicó en Pons v. Engebretson, 160 D.P.R. 347, 357 (2003), en el citado caso de López, v. Gobierno Mun. de Cataño, supra, no se le impuso responsabilidad al Municipio (como principal) por la negligencia del conductor de un camión contratado por éste para realizar labores de limpieza en un solar yermo. El conductor del camión impactó a una menor que iba en una bicicleta. Como se explicó, en ese caso se resolvió que los daños sufridos por la menor fueron provocados por la negligencia del conductor al no tomar las precauciones necesarias para conducir un vehículo de motor por un área cercana a una escuela elemental y a un parque. El daño provocado se debió a la inobservancia de las precauciones de rutina que debe tomar el conductor de un vehí culo de motor. La falta de precaución del conductor no era previsible para el Municipio; por tanto, se desestimó la demanda en cuanto a éste.
En Pons v. Engebretson, supra, pág. 358, se indicó que la adecuada interpretación de la norma de responsabilidad para los que emplean contratistas independientes, según Martínez, v. Chase Manhattan Bank, supra, y López, v. Gobierno Mun. de Cataño, supra, debe ser que quien emplea (el principal), no responda por la negligencia del contratista independiente cuando el último omita las medidas de cuidado rutinarias para llevar a cabo la labor que le ha sido encomendada. Tampoco debe responder cuando la falta de cuidado del contratista independiente no era previsible para el principal.
En el caso ante nuestra consideración, primero, distinto a como sucedió en López v. Gobierno Mun. de Cataño, supra, el acto negligente se cometió dentro del área de trabajo para el que la apelante subcontrató a Marcos Santiago López. Segundo, los hechos sugieren que, fuera o no una precaución de rutina el que el conductor de un camión de acarreo, luego de descargar la plataforma, la bajara para seguir conduciendo en el proyecto, la ejecución de la obra encomendada a Marcos Santiago López, bien por la naturaleza del trabajo o bien por el lugar en la que se llevaba a cabo, estaba permeada de riesgos especiales que.debió prever la apelante. Nos negamos a liberar de responsabilidad a la apelante por las actuaciones negligentes de su contratista independiente Marcos Santiago López.
Por otro lado, el TPI no hizo una especial distribución de culpa entre los codemandados. Se limitó a determinar que, frente al perjudicado, éstos respondían solidariamente. Sobre el particular, destacamos que lo *910 importante en esta fase del pleito, es el reconocimiento del derecho del apelado a repetir contra cualquiera de los codemandados, incluso por la totalidad de la indemnización concedida. Todos ellos, en su relación con el perjudicado, figuran como deudores solidarios.
Lo anterior implica que el apelado podrá cobrar exclusivamente a la apelante el importe de la sentencia, de así desearlo. Art. 1097 del Código Civil, 31 L.P.R.A. §3108. Ello, claro está, no menoscaba el derecho que generaría la apelante para reclamarle a los demás codemandados la parte de la deuda que les hubiera correspondido a ellos pagar. Art. 1098 del Código Civil, 31 L.P.R.A. §3109.
Ahora bien, estamos conscientes de que el TPI no detalló ni distribuyó las obligaciones de los codemandados para con el apelado. Sobre el particular, destacamos que recientemente se rechazó que se devolviera el caso para que tal asunto se resolviera, en caso de que las circunstancias lo permitieran, en un pleito de nivelación entre los deudores solidarios o cocausantes de los daños. Más bien, se determinó que cuando no media una determinación judicial de la porción exacta de culpa de los cocausantes o cuando el efecto dañoso de la actuación de los cocausantes no es susceptible de ser medido, procede la imposición de responsabilidad solidaria en cuotas contributivas iguales. US Fire Insurance Company v. Autoridad de Energía Eléctrica, res. el 24 de septiembre de 2008, 2008 JTS 180, citando a Sánchez Rodríguez v. López Jiménez, 118 D.P.R. 701, 710 n.2 (1987); Torres Ortiz v. E.L.A., 136 D.P.R. 556, 567, n. 6 (1994); y al Art. 1091 del Código Civil de Puerto Rico, 31 L.P.R.A. §3102. Siguiendo el precedente establecido en el citado caso, concluimos que, en esta etapa procesal, debemos inferir que los codemandados responden por partes iguales al apelado. De esta manera, resolvemos el segundo señalamiento de error.
B
El lucro cesante es aquella partida de daños que debe ser resarcida por concepto de la pérdida de ingresos ocasionada al perjudicado y la disminución de su capacidad productiva. S.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614, 623 (2002); Rodríguez v. Ponce Cement Corp., 98 D.P.R. 201 (1969). Como elemento de daño, el reclamante debe establecer que la interrupción y cese de sus ingresos fue ocasionada por las actuaciones del demandado. S.L.G. Rodríguez v. Nationwide, supra, páginas 623-624. Propiamente hablando, no es una indemnización por lesiones o enfermedad ya que éstas tienen el propósito básico de restaurar el daño físico causado, pero como no puede hacerse en especie, se sustituye con dinero. Id.
Sobre el mismo asunto, se ha comentado que el lucro cesante refiere a los ingresos o ganancias futuras que era de esperarse, con razonable probabilidad, que la persona perjudicada devengase. Según se ha indicado, es necesario demostrar esa razonable probabilidad. También, precisa demostrar que el perjudicado ha tenido ingresos previos derivados de su trabajo o actividad lucrativa. C. Irizarry Yunqué, Responsabilidad Civil Extracontractual, 4ta ed., San Juan, 200, pág. 491.
AI estimar y valorizar la partida de lucro cesante, permea esencialmente un elemento de razonabilidad. S.L. G. Rodríguez v. Nationwide, supra, pág. 625. Las ecuaciones matemáticas utilizadas en las distintas decisiones que involucran el cómputo de lucro cesante, no constituyen una fórmula fija y rígida que deba aplicarse de forma estricta en toda determinación de lucro cesante. Las fórmulas utilizadas no pretenden exponer de manera absoluta todos los criterios matemáticos a tomarse en cuenta. Las referidas fórmulas están sujetas a los ajustes necesarios para que respondan a las situaciones del momento. Lo realmente esencial es que la base utilizada al hacer los cómputos sea una razonable en aras de una determinación prudente. Id.
Basándonos en lo anterior, destacamos lo siguiente. Como parte del tercer señalamiento de error, la apelante cuestionó no sólo la concesión de una indemnización por lucro cesante a favor del apelado, sino también el monto de la partida. En reacción a su reclamo, estimamos que, en efecto, el apelado acreditó satisfactoriamente que había trabajado antes de los hechos objeto del pleito y evidenció cuánto ingreso generaba. También, demostró que las lesiones que sufrió le incapacitaron e incidieron en su capacidad para generar ingresos. Aquél *911 probó que estaba generando ingresos y que su gestión laboral fue interrumpida por las actuaciones culposas de los codemandados, lo cual incluye a la apelante.
Ahora bien, la prueba en tomo a los ingresos que generaba el apelado fue la siguiente. Hasta el año 2001, última ocasión en que rindió planillas de contribución sobre ingresos, generaba entre $12,000 a $15,000. En el 2002, comenzó a recibir el seguro social y dejó de trabajar. En el 2003, el apelado se reincorporó a la fuerza laboral, eso sí, limitándose a generar ingresos ascendentes a $1,000 o $2,000.
El TPI computó la partida de lucro cesante a razón de $10,000 por cada año en que se interrumpió la gestión laboral del apelado entre la fecha del accidente y la fecha en que se emitió la sentencia final. En esa misma fecha, el apelado cumplió los 70 años. Aunque no exista una fórmula taxativa para fijar una cuantía de lucro cesante, tomamos en cuenta que esa edad ha servido de guía para determinar la expectativa de vida productiva en otros casos como el que revisamos. [8] Agregamos que del lenguaje utilizado por el TPI, inferimos que el referido foro estimó razonable que a esa fecha, el apelado hubiera podido seguir trabajando y generando ingresos. No intervendremos con esta apreciación.
No obstante, con lo que sí nos vemos precisados a intervenir es con los ingresos anuales que se usaron de base para el cómputo. La prueba, como indicamos, estableció que lo que generaba el apelado a la fecha del accidente era entre $1,000 a $2,000, excluyendo los beneficios del seguro social que comenzó a recibir en el 2002. Por tanto, estimamos razonable y prudente, que para el cómputo de lucro cesante en este caso se tomaran en cuenta esas sumas.
En aras de cumplir con un fin justiciero y de conceder un remedio que compense adecuadamente las ganancias razonablemente frustradas del apelado, modificamos el dictamen apelado. Lo anterior, a los efectos de reducir la partida de lucro cesante a $9,000. Este es el producto que arroja el cálculo de: primero, los 6 años en que quedó interrumpida la gestión laboral del apelado, desde la fecha del accidente (en el 2003), hasta la fecha en que se dictó sentencia (en el 2008), la cual coincidió con la fecha en que alcanzó sus 70 años el apeládo; y segundo, un promedio de los ingresos que probó generar el apelado a la fecha del accidente, luego de haberse retirado ($1,500). Estimamos, entonces, que se cometió el tercer error señalado.
C
La Regla 44.1(d) de las de Procedimiento Civil, 32 L.P.R.A., Ap. Ill, R. 44.1(d), dispone que en caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que se entienda correspondan a tal conducta. Se ha expresado que el objetivo de esta norma procesal es castigar a aquel litigante perdidoso que por su terquedad, obstinación, frivolidad o insistencia, obliga a asumir innecesariamente los gastos e inconveniencias de un pleito. Martí Méndez v. Abréu Feshold, 143 D.P.R. 520 (1997); Corpak, Art. Printing v. Ramallo Brothers, 125 D.P.R. 724 (1990). Los honorarios de abogado se conceden como sanción contra quien por su temeridad ha hecho necesario un pleito que pudo evitarse, que lo prolongue innecesariamente, o que produzca la necesidad de que otra parte incurra en gestiones evitables. Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. 695 (1999). Ahora bien, no puede penalizarse a un litigante que utilice las vías judiciales para vindicar un derecho por el mero hecho de no haber prevalecido. Oliveras, Inc. v. Universal Insurance Co., 141 D.P.R. 900 (1996).
Con estos principios en mente, discutimos el cuarto señalamiento de error planteado por la apelante. Concluimos que no se cometió el error.
El TPI ordenó el pago de $5,000 de honorarios de abogado. Entendemos que la apelante incurrió en temeridad en el trámite del pleito que pudo en gran medida evitarse
*912 Ill
En mérito de lo anterior, modificamos la Sentencia final que se dictó en el pleito. De este modo, determinamos que los codemandados son responsables, por partes iguales, de las partidas concedidas a favor del apelado como remedio. Además, reducimos a $9,000 la partida concedida al apelado por lucro cesante.
Así modificado, se confirma el referido dictamen en el resto de sus extremos.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Leda. María E. Pérez Ortiz Secretaria del Tribunal de Apelaciones
ESCOLIOS 2009 DTA 37

1. Transcripción de la prueba oral, Vista de Daños, 17 de marzo de 2008, pág. 22.

2 .Id.

3. Id., pág. 12.

4. Id.

5. Id., pág. 26.

6. Escrito de Apelación, pág. 9.

7. El dueño de la obra era el Municipio de San Juan que contrató con una desarrolladora la construcción de un sistema de alcantarillado. Esta última, a su vez, subcontrató con otra desarrolladora cuyos empleados ocasionaron directamente los daños.

8. Véase, Suro v. E.L.A., 111 D.P.R. 456 (1981).